# In the United States Court of Federal Claims

Nos. 25-82, 25-95, 25-152, 25-172, 25-225, 25-295
(Filed Under Seal: September 10, 2026)
(Reissued for Publication: November 16, 2026)[1]

| | |
|---|---|
| BEAT-LDI JV LLC, *et al.*, | * |
| Plaintiffs, | * |
| v. | * |
| THE UNITED STATES, | * |
| Defendant. | * |

*Alexander Brewer Ginsberg*, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, DC, counsel for Plaintiff, BEAT-LDI JV LLC. With whom were *Katherine St. Romain*, and *Robert C. Starling*, of counsel.

*Elizabeth Newell Jochum*, Blank Rome LLP, Washington, DC, counsel for Plaintiff, GenceTek LLC. With whom were *Samarth Barot*, and *Shane M. Hannon*, of counsel.

*Matthew Thomas Schoonover*, Schoonover & Moriarty LLC, Olathe, KS, counsel for Plaintiff, OM Partners JV 2, LLC. With whom were *Ian P. Patterson*, *Timothy J. Laughlin*, and *Haley M. Sirokman*, of counsel.

*Ryan Christopher Bradel*, Ward & Berry PLLC, Tysons, VA, counsel for Plaintiff, Assyst, Inc. With whom were *P. Tyson Marx*, and *Mary Pat Buckenmeyer*, of counsel.

*David Bailey Dixon*, Pillsbury Winthrop Shaw Pittman LLP, Tysons, VA, counsel for Plaintiff, DevTech Systems, Inc. With whom were *Toghrul M. Shukurlu*, *Aleksey R. Dabbs*, and *Alexis P. Landrum*, of counsel.

*Tenley Anne Carp*, Arnall Golden Gregory LLP, Washington, DC, counsel for Plaintiff, Rigil Corporation. With whom was *Sydney Selman*, Atlanta, GA, of counsel.

[1] This Opinion and Order was filed under seal on September 10, 2026, [ECF 109], in accordance with the protective order entered in this case, [ECF 11]. The parties were given an opportunity to identify protected information, including source selection information, proprietary information, and confidential information, for redaction. The parties filed a joint status report on September 30, 2026, with proposed redactions. [ECF 112]. The Court accepts the proposed redactions. All redactions are indicated by bracketed asterisks, e.g., "[* * *]."

*Vincent de Paul Phillips*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Carmody G. Daman*, Senior Assistant General Counsel, General Services Administration, of counsel.

**OPINION AND ORDER**

**DIETZ, Judge.**

In this consolidated post-award bid protest, six disappointed offerors challenge the evaluation of proposals by the General Services Administration ("GSA") under Request for Proposal ("RFP") No. 47QTCB22R0001 for the Polaris Government-Wide Acquisition Contract ("GWAC") Small Business ("SB") pool. Before the Court are motions for judgment on the administrative record ("MJAR") filed by Rigil Corporation ("Rigil") [ECFs 62, 66];[2] OM Partners JV 2, LLC ("OM Partners") [ECF 65]; Assyst, Inc. ("Assyst") [ECF 69]; GenceTek LLC ("GenceTek") [ECF 70]; DevTech Systems, Inc. ("DevTech") [ECF 71]; and BEAT-LDI JV LLC ("BLJV") [ECF 74]. Also before the Court is the government's cross-MJAR [ECF 86]. For the reasons set forth below, the Court **GRANTS** the MJARs filed by DevTech and OM Partners, and **DENIES** the MJARs filed by GenceTek, BLJV, Rigil, and Assyst.

## I. BACKGROUND

GSA designed the Polaris program to address "a governmentwide need to access highly qualified Information Technology (IT) contractors" while also satisfying each government agency's "need to meet [its] small and socioeconomic small business contracting goals." AR Tab 30 at 23.[3] The program is separated into four pools.[4] *Id.* at 24. This protest concerns only the SB pool. *See id.* at 25.

### A. Polaris SB Pool RFP History

GSA issued the RFP for the Polaris GWAC SB pool for "a multiple award, indefinite-delivery, indefinite-quantity [("IDIQ")] contract," AR Tab 3 at 14, on March 25, 2022, *id.* at 11. Proposals were due on May 13, 2022. *Id.* at 74. The RFP contemplated awarding IDIQ contracts to the top 100 highest technically rated qualifying ("HTRQ") offerors. *Id.* at 99. It provided that,

---

[2] Rigil initially filed an unsealed version of its MJAR, which the Clerk of the Court subsequently sealed. *See* [ECF 62]. On the same day, Rigil also filed a sealed version of its MJAR separately on the docket. [ECF 66]. As these are duplicate filings, the Court cites to only [ECF 66] when referring to Rigil's MJAR.

[3] The administrative record filed by the government consists of tabbed documents within three volumes. Each document has its own tab, and most tabs are paginated with a Bates number (*e.g.*, Tab 1 GSAV1_000001). The Court cites to the administrative record by tab and Bates number (*e.g.*, AR Tab 1 at 1). However, the documents within AR Tab 68 are not separately paginated with Bates numbers. *See generally* AR Tab 68. Each AR Tab 68 file includes a Bates number in the file name (*e.g.*, GSAV2_2_08702_OM Partners JV 2, LLC). Accordingly, the Court cites to documents in AR Tab 68 by the Bates number in the file name and PDF page, if applicable (*e.g.*, AR Tab 68 at 8702, *1). When quoting from the administrative record, the Court omits unnecessary capitalization.

[4] The four pools include: a Historically Underutilized Business Zone ("HUBZone") pool, a Service-Disabled Veteran Owned Small Business ("SDVOSB") pool, an SB pool, and a Women-Owned Small Business ("WOSB") pool. AR Tab 30 at 24.

"[i]n accordance with 41 U.S.C. [§] 3306(c) and [the] associated GSA Class Deviation CD-2020-14, cost and pricing information will not be considered at the master contract level." *Id.* The RFP was amended seven times based upon industry feedback, and the proposal submission deadline was ultimately extended to October 7, 2022. *See* AR Tab 43 at 211-12; *see also* AR Tabs 5, 7-8, 11, 13-16 (Amendments 0001 through 0007).

On October 7, 2022, GSA received 569 proposals. AR Tab 43 at 212. On the same day, two small businesses—not parties in the instant case—filed pre-award bid protests in the United States Court of Federal Claims. *Id.* The protesters alleged that GSA violated Small Business Administration ("SBA") regulations governing joint ventures ("JVs") "by subjecting [JVs] to 'the same' evaluation criteria as offerors generally . . . [and that GSA violated] 41 U.S.C. § 3306(c) by failing to consider price as an evaluation factor at the IDIQ level." *SH Synergy, LLC v. United States*, 165 Fed. Cl. 745, 758 (2023); *see* AR Tab 43 at 212. On April 21, 2023, the court in that case found that the challenged RFPs for the Polaris pools "violate[d] [SBA regulations] by applying the same evaluation criteria to projects submitted by protégé firms and other offerors alike," *SH Synergy, LLC*, 165 Fed. Cl. at 775, and "violate[d] federal procurement law because [GSA] d[id] not adequately 'feature' task orders 'based on hourly rates,' as contemplated under 41 U.S.C. § 3306(c)(3)," *id.* at 776. The court enjoined GSA "from evaluating proposals and awarding IDIQ contracts under the current versions of the [RFPs] . . . [and required GSA to] amend the [RFPs], and evaluate proposals under those [RFPs], consistent with and in compliance with [the court's] Memorandum and Order." *Id.* at 786.

Following that decision, GSA twice amended the RFP for the Polaris GWAC SB pool. On September 20, 2023, GSA issued Amendment 0008, which requested that offerors agree to extend the minimum acceptance period for their proposals to September 30, 2024, by signing and submitting the Standard Form ("SF") 30. AR Tab 18 at 1164. This amendment was necessary because otherwise the offerors' proposals would exceed the minimum acceptance period set forth in the RFP. *See* AR Tab 3 at 75 (establishing a minimum offer acceptance period of at least 365 days from receipt of proposals). Next, on September 29, 2023, GSA issued Amendment 0009, AR Tab 20 at 1241, which required offerors to provide partially revised proposals with cost/price information, *see id.* at 1254, and which changed the evaluation methodology from HTRQ to highest technically rated with fair and reasonable pricing ("HTRFRP"), *id.* at 1254, 1353. GSA amended the RFP three more times, with Amendment 0012 reflecting the most recent version of the RFP. *See* AR Tab 43 at 213; *see also* AR Tabs 23, 26-27 (Amendments 0010 through 0012).

### B. Relevant RFP Terms and Conditions

The RFP contained proposal submission instructions. *See* AR Tab 27 at 1648-49. The RFP advised offerors "to read the <u>entire</u> [RFP], including <u>all</u> attachments in Section J, <u>prior</u> to submitting questions and/or preparing a proposal" and warned that "[o]mission of any information from the proposal submission requirements may result in rejection of the offer." *Id.* at 1648. The RFP further informed offerors that "[a]ll proposal information is subject to verification by the government," *id.* at 1649, that "[t]he offeror is required to ensure all proposal information submitted is verifiable," *id.*, and that "[i]f the GSA source selection team detects a high degree of unverifiable, contradictory, or unsubstantiated information submitted in an offeror's proposal, the government will end the proposal evaluation, and the offeror will be

removed from being considered for award," *id.* In addition, the RFP required all offerors to submit their respective proposals through the Polaris Submission Portal ("PSP"). *Id.* at 1648.

Regarding the basis for award, the RFP stated that "[t]he source selection process on Polaris will neither be based on the lowest price technically acceptable (LPTA) nor tradeoffs." AR Tab 27 at 1681. It explained that "[w]ithin the best value continuum, FAR 15.101 defines best value as using any one or a combination of source selection approaches" and that "[f]or Polaris, the best value basis for awards will be determined by the [HTRFRP]." *Id.* It further explained that "[a]ll evaluation factors other than price, when combined, are significantly more important than price." *Id.* The RFP stated that GSA "intends to make 100 awards in the [SB] [p]ool [and,] to be considered as a[n] [HTRFRP] offeror, the proposal must score amongst the 100 highest rated offers . . . [with] all offerors tied at the 100th position [] receiv[ing] an award." *Id.*

The proposal evaluation process required that each offeror "claim" technical evaluation points from a total possible 95,000 points by self-scoring its proposal in accordance with certain evaluation elements enumerated in the Polaris scoring table. *See* AR Tab 27 at 1681-83; *see also id.* at 1685-87 (Polaris scoring table). The specific proposal requirements for these evaluation elements were set forth in Sections L.5.2 Relevant Experience; L.5.3 Past Performance; L.5.4 Systems, Certifications, and Clearances; and L.5.5 Risk Assessment. *See id.* at 1683, 1685-87.

Section L.5.2 Relevant Experience required offerors to submit primary relevant experience projects that were equal to or greater than $250,000 and that demonstrated performance in one of five listed North American Industry Classification System ("NAICS") codes.[5] AR Tab 27 at 1659-61. Offerors were also allowed to submit emerging technology relevant experience projects that were equal to or greater than $250,000 and that demonstrated performance in one of the six listed emerging technology categories.[6] *Id.* at 1666-67. For each primary relevant experience and emerging technology project, offerors were required to provide specific verification documentation. *Id.* at 1661-62 (verification documentation for primary relevant experience submissions for federal government contracts); *id.* at 1666-68 (verification documentation for emerging technology submissions).

Section L.5.5 Risk Assessment, referred to as Organizational Risk Assessment ("ORA"), allowed offerors to "receive additional points for demonstrating that it has previously performed in the same business arrangement" as proposed. AR Tab 27 at 1685; *see id.* at 1672. Such business arrangements included performing as an individual company, a JV, a prime contractor with proposed subcontractors, or a JV with proposed subcontractors. *Id.* at 1672. Depending on the proposed business arrangement, offerors were required to satisfy applicable conditions set

[5] Section L.5.2.2.1 of the RFP lists the following NAICS codes: 518210 – Data Processing, Hosting, and Related Services; 541511 – Custom Computer Programming Services; 541512 – Computer Systems Design Services; 541513 – Computer Facilities Management Services; and 541519 – Other Computer Related Services. AR Tab 27 at 1660.

[6] Section L.5.2.3.1 of the RFP lists the following emerging technologies by RFP section reference: C.3.1.1 – Advanced and Quantum Computing; C.3.1.2 – Artificial Intelligence; C.3.1.3 – Automation Technology; C.3.1.4 – Distributed Ledger Technology; C.3.1.5 – Edge Computing; and C.3.1.6 – Immersive Technology. AR Tab 27 at 1666-67.

forth in the RFP and provide verification documentation. *Id.* at 1672-73 (verification documentation for ORA submissions).

Upon receipt of the proposals, the RFP contemplated "ranking the proposals in order from [the] highest total claimed score to [the] lowest total claimed score." AR Tab 27 at 1681. Thereafter, "[a] screening process of the top 100 w[ould] commence to verify support[ing] documentation for all the applicable evaluation elements submitted into the [PSP] . . . [to] verify the top 100 met all [] the acceptability review requirements[.]" *Id.* at 1682. Specifically, the acceptability review was designed to evaluate proposals "to determine whether the requested proposal submission information meets the criteria for information requested in Section L.5.1 and is current, accurate, and complete." *Id.* at 1683. Such proposal submission information included completed SF33 forms (including acknowledgement of amendments to the RFP on the SF33 or on the SF30 for each amendment), the offeror's representations and certifications, the offeror's JV documentation, if applicable, and the offeror's meaningful relationship commitment letter(s) ("MRCL"),[7] if applicable. *Id.* at 1651-58. If one of the top 100 highest scoring proposals failed this "acceptability review," it would be replaced by the next highest scoring proposal outside the top 100 highest scoring proposals. *Id.* at 1682.

Following the acceptability review, the RFP stated that "the evaluation team w[ould] then evaluate and verify the top 100s' support[ing] documentation for each evaluation element." AR Tab 27 at 1682. The RFP stated that "[i]n the event a claimed evaluation element is refuted (found to be unsubstantiated or otherwise not credited), the offeror's claimed score w[ould] have the point value of the refuted evaluation element deducted and the proposal w[ould] be re-sorted based upon the revised score[.]" *Id.* GSA would continue to evaluate the proposal if it remained in the top 100, but "[i]f the proposal d[id] not remain in the top 100, the evaluation for that proposal w[ould] stop and the next highest rated proposal (based upon claimed score) that provide[d] the required support[ing] documentation for all the applicable evaluation elements and passe[d] the acceptability review w[ould] join the top 100 and evaluation w[ould] begin on that proposal." *Id.*

After completion of the technical evaluation, "[t]he evaluation team w[ould] check to verify [that] the top 100 have proposed fair and reasonable pricing." AR Tab 27 at 1682. If it was determined that "an offeror has not provided fair and reasonable pricing, the offeror [would] be eliminated from further consideration for award unless discussions are conducted." *Id.* However, the RFP stated that GSA "intends to award contracts without discussions," that GSA "may conduct clarifications, as described in FAR 15.306(a)," and that GSA "reserves the right to conduct discussions if determined necessary." *Id.* at 1681. The RFP explained that "[t]he evaluation process w[ould] continue until the 100 apparently successful offerors [were] identified, representing the [HTRFRP] offerors (based on validated scores, fair and reasonable pricing, and passing the overall responsibility determination)." *Id.* at 1682.

[7] A MRCL is a document that offerors could submit with their proposal that allowed it to "utilize resources from a parent company, affiliate, division, and/or subsidiary . . . to take credit for relevant experience project(s), system(s), certification(s), or clearance(s) . . . so long as there [wa]s a meaningful relationship to the offeror and [a MRCL is] provided to [GSA]." AR Tab 27 at 1657.

For the overall responsibility determination, the RFP stated that GSA would make the determination "on a pass/fail basis." AR Tab 27 at 1687. It explained that GSA could "use any relevant information in its possession or in the public domain, including other past performance information available within the government and in non-government databases[.]" *Id.* It further explained that GSA would evaluate Professional Employee Compensation Plans ("PECPs") "in accordance with [S]ection[] L.5.6.1." *Id.* Section L.5.6.1 incorporated the full text of FAR 52.222-46 Evaluation of Compensation for Professional Employees (FEB 1993), *id.* at 1673-74, and stated as follows:

> The offeror must submit a [PECP] that addresses the offeror's methodology for determining salaries and fringe benefits for their professional employees in preparation of future task order requirements under Polaris. Submission of the general compensation practices printed in the offeror's employee handbook including salary and fringe benefits will often be sufficient.

*Id.* at 1673. The responsibility determination also involved a review of each offeror's financial statements to confirm that the offeror had "adequate financial resources to perform the contract, or the ability to obtain them." *Id.* at 1675. Ultimately, "offerors which [we]re not deemed responsible w[ould] not be considered for award." *Id.* at 1687.

### C. Evaluation, Award Decision and Bid Protests

In accordance with the RFP, GSA conducted an acceptability review, AR Tab 44, a technical evaluation, AR Tab 45, a responsibility determination, AR Tab 46, and a cost/price analysis, AR Tab 47, and issued a source selection decision memorandum, AR Tab 43. GSA issued clarifications to several offerors during the evaluation process. *See generally* AR Tab 69. On December 30, 2024, GSA issued a notice of award, which stated that it planned "to make contract awards to 102 offerors (due to a [three-way] tie at the 100th position)." AR Tab 48 at 1; *see* AR Tab 49. The notice advised that "offerors not identified [] were not within the top 100 [HTRFRP] offerors, based on the evaluation criteria as established in the [RFP]." AR Tab 48 at 1. To be within the top 100 highest scoring proposals and receive an award, an offeror needed a final verified score of 89,800. *See* AR Tab 71 at 12453-55. The notice of award "encouraged [offerors not selected for award] to login to the [PSP] and review their individual debriefing letter." AR Tab 48 at 1.

On January 17, 2025, BLJV and GenceTek filed bid protests in this court challenging the Polaris GWAC SB pool procurement. *See* BLJV Compl. [ECF 1]; Compl., *GenceTek LLC v. United States*, No. 25-95 (Fed. Cl. filed Jan. 17, 2025). On January 27, 2025, the Court issued an order consolidating these protests and designating BLJV's case as the lead case. [ECF 10]. The Court amended this order three times to consolidate additional bid protests under the lead case. *See* [ECF 21] (consolidating *OM Partners JV 2, LLC v. United States*, No. 25-152 (Fed. Cl. filed Jan. 28, 2025) and *Assyst, Inc. v. United States*, No. 25-172 (Fed. Cl. filed Jan. 29. 2025) under lead case); [ECF 31] (consolidating *Network Runners, Inc. v. United States*, No. 25-213 (Fed. Cl. filed Feb. 5, 2025) and *DevTech Sys. Inc. v. United States*, No. 25-225 (Fed. Cl. filed Feb. 6, 2025) under lead case); [ECF 38] (consolidating *Rigil Corp. v. United States*, No. 25-295 (Fed.

Cl. filed Feb. 19, 2025) under lead case). Each protester filed an MJAR on August 29, 2025,[8] *see* [ECFs 65-66, 69-71, 74], and the government filed its cross-MJAR on December 23, 2025, [ECF 86]. The motions are fully briefed, Pls.' Replies & Resps.' [ECFs 87, 89-93]; Def.'s Reply [ECF 103], and the Court held oral argument on April 24, 2026, *see* [ECF 99].

## II. STANDARD OF REVIEW

The Tucker Act grants this court jurisdiction "to render judgment on an action by an interested party objecting . . . to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This waiver of sovereign immunity "covers a broad range of potential disputes arising during the course of the procurement process," including "objections to an award" decision. *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012) (citations omitted). "When proceedings before an agency are relevant to a decision in a case, the administrative record of those proceedings must be . . . filed with the court." RCFC 52.1(a). Parties may then "file a[n MJAR] for the [c]ourt to assess whether [the agency], given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review." *Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 17 (2019) (citation omitted), *aff'd*, 959 F.3d 1379 (Fed. Cir. 2020); *accord Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021) (noting that the court's inquiry is limited to "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record" (quoting *XOtech, LLC v. United States*, 950 F.3d 1376, 1379 (Fed. Cir. 2020))). This procedure allows "parties to seek the equivalent of an expedited trial on a 'paper record, allowing fact-finding by the trial court.'" *Young v. United States*, 497 F. App'x 53, 58-59 (Fed. Cir. 2012) (quoting *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)), *cert. denied*, 569 U.S. 964 (2013).

When a party challenges an agency's contract award decision, the court reviews the decision using the standard of review set forth in the Administrative Procedure Act ("APA"). *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). This standard provides that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "In applying the APA to protests . . . [the court] determine[s] whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 (Fed. Cir. 2004)); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that the court will not uphold an agency decision where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation . . . counter to the evidence before [it], or is so implausible [] it could not be ascribed to a difference in view or the product of agency expertise"). "[P]rocurement decisions are subject to a 'highly deferential rational basis review.'" *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343

---

[8] On the same day, Network Runners Inc. filed a notice of voluntary dismissal, [ECF 61], and its complaint was subsequently dismissed, *see Network Runners, Inc.*, No. 25-213.

(Fed. Cir. 2021) (alteration in *Safeguard Base Operations, LLC*) (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010)).

However, the considerable deference afforded to an agency under the APA "is not a rubber stamp." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 742 (2000) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995)); *see also FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 376 (2011) ("Whenever a procurement decision is without a rational basis or is based upon a clear violation of law, that decision must be set aside."). When reviewing an agency action, "the court must determine if the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *Distributed Sols., Inc. v. United States*, 104 Fed. Cl. 368, 382 (2012) (alterations in *Distributed Sols., Inc.*) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43); *see also Golden IT, LLC v. United States*, 177 Fed. Cl. 118, 136 (2025) (recognizing that an agency violates the APA where its "findings or decisions are conclusory or unexplained in the administrative record" because "the APA requires the government to show its work" (first citing *Consol. Safety Servs., Inc. v. United States*, 167 Fed. Cl. 543, 564 n.11 (2023); and then citing *CAN Softtech, Inc. v. United States*, No. 24-670, 2024 WL 4434253, at *6 (Fed. Cl. Oct. 4, 2024)). "Further, it is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Camp v. Pitts,* 411 U.S. 138, 142-43 (1973)).

If the challenging party persuades the court "that the government's conduct fail[ed] the APA review," *Bannum*, 404 F.3d at 1351, it then "must establish that it was prejudiced by the contracting officer's action," *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1153 (Fed. Cir. 2023). "'To establish prejudicial error,' a party must show that 'but for the error, it would have had a substantial chance of securing the contract.'" *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 (Fed. Cir. 2020) (quoting *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009)), *cert. denied*, 142 S. Ct. 68 (2021) (mem.). "Put another way, to show prejudice a disappointed bidder needs to show that 'it had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest.'" *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

## III. DISCUSSION

In this protest, six offerors challenge GSA's proposal evaluation and award decision under the RFP for the Polaris GWAC SB pool. The Court first resolves the challenges raised by three of the protesters to GSA's PECP evaluation. The Court then turns to the remaining challenges raised by each of these three protesters and, thereafter, the challenges raised by the remaining three protesters. To the extent that the protesters demonstrate that GSA's procurement actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the Court will decide whether such protesters were prejudiced by GSA's errors within the section that addresses the protester's challenges.

### A. GenceTek's, DevTech's, and BLJV's Challenges to GSA's PECP Evaluation

GenceTek, DevTech, and BLJV argue that GSA failed to properly conduct an evaluation of each offeror's PECP as required by FAR 52.222-46. [ECF 70] at 16; [ECF 71-1] at 18; [ECF 74] at 42.[9] GenceTek contends that GSA "did not perform the [PECP] evaluation required by FAR 52.222-46 [because this provision] requires the government to evaluate offerors' total compensation plan," and instead GSA only "assess[ed] whether each offeror included [***] in its PECP." [ECF 70] at 18. GenceTek argues that GSA's "box-check approach to the PECP evaluation . . . could not evaluate whether offerors will obtain and keep the quality of professional services needed for adequate contract performance without consideration of the differences between the incentives being offered," *id.* at 20, and that GSA "did no evaluation of the impact of [] direct labor rates—which correspond directly to employee pay—on the ability to recruit and retain professional employees," *id.* GenceTek also contends that GSA "used an unstated evaluation scheme by substituting the evaluation required by the FAR (and therefore the RFP) with a requirement that offerors' PECPs include [***]." *Id.* at 22. GenceTek asserts that GSA "used a significantly different basis in evaluating the proposals than was disclosed—limiting the universe of compensation that would be considered to just an undisclosed list and converting the required holistic and qualitative compensation evaluation required by the FAR and RFP to a limited box-check exercise." *Id.* at 23-24. Next, DevTech argues that "the record . . . is devoid of any evaluation of the offerors['] direct labor rates and fringe benefit rates for realism." [ECF 71-1] at 19 (emphasis omitted). DevTech contends that GSA's "one-paragraph description of its [PECP] evaluation illustrates that [it] failed to review the direct labor rates as part of [its] evaluation, and merely conducted an analysis of the description of fringe benefits without regard to the rates to be paid to the professional employees." *Id.* at 20. According to DevTech, "[s]uch an evaluation, even if it were documented, is woefully deficient and does not meet the requirements of FAR 52.222-46 and the [RFP]." *Id.* Lastly, BLJV argues that "the record contains no documentation of GSA's realism analysis pertaining to the awardees' [PECPs.]" [ECF 74] at 43.

The government maintains that GSA evaluated the offerors' respective PECPs "as part of [its] overall responsibility and [that] GSA has broad discretion in evaluating responsibility." [ECF 86] at 54; *see id.* at 74-75, 93-94. According to the government, "the RFP provides that PECPs will initially be evaluated for purposes of assessing responsibility[, and] [t]o assess responsibility, GSA must only look to the general compensation practices to determine whether an offeror is responsible." *Id.* at 59. The government contends that a "more detailed evaluation of PECPs will occur at the task order level—when precise information is available on the pricing and fringe benefit[] plans for the professional employees required to complete an individual task order." *Id.* at 60; *see id.* at 75, 95. Additionally, the government argues that the protesters' challenges to the PECP evaluation are waived because "[t]he terms of the RFP made clear that GSA was not going to perform any cost realism type analysis at all[.]" *Id.* at 62; *see id.* at 75-76, 95-96. Regarding GenceTek's unstated evaluation criteria argument, the government counters that "GenceTek has not established that GSA used unstated evaluation criteria because GSA stated it would evaluate fringe benefits as part of PECP, and it did not deviate from doing so," *id.* at 77, and that "GSA did not require offerors to propose a specific amount or type of fringe

---

[9] The Court cites to the filings on the docket using the page numbers generated by the CM/ECF system. When quoting from the filings on the docket, the Court omits unnecessary capitalization.

benefits [but] [i]nstead, [] allowed vendors to identify common fringe benefit categories they offer as part of employee compensation," *id.* at 78 (citing AR Tab 27 at 1673-74).

Based on the record, the Court finds that GSA failed to conduct a proper PECP evaluation in accordance with FAR 52.222-46 and applied an unstated evaluation criterion by requiring offerors' PECPs to include a [***] fringe benefits from an enumerated list. Section L.5.6 of the RFP contains the following requirement:

> **L.5.6.1 Professional Employee Compensation Plan**
>
> The government is concerned with the quality and stability of the work force to be employed on this contract. Professional compensation that is unrealistically low or not in reasonable relationship to the various job categories may impair the Contractor's ability to attract and retain competent professional service employees or may be viewed as evidence of failure to comprehend the complexity of future task order requirements.
>
> The offeror must submit a [PECP] that addresses the offeror's methodology for determining salaries and fringe benefits for their professional employees in preparation of future task order requirements under Polaris. Submission of the general compensation practices printed in the offeror's employee handbook including salary and fringe benefits will often be sufficient.

AR Tab 27 at 1673. Section L.5.6.1.1 incorporates the full text of FAR 52.222-46. *Id.* This provision, in relevant part, states:

> (a) Recompetition of service contracts may in some cases result in lowering the compensation (salaries and fringe benefits) paid or furnished professional employees. This lowering can be detrimental in obtaining the quality of professional services needed for adequate contract performance. It is therefore in the Government's best interest that professional employees . . . be properly and fairly compensated. As part of their proposals, offerors will submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract. The Government will evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements. This evaluation will include an assessment of the offeror's ability to provide uninterrupted high-quality work. The professional compensation proposed will be considered in terms of its impact upon recruiting and retention, its realism, and its consistency with a total plan for compensation. Supporting

> information will include data, such as recognized national and regional compensation surveys and studies of professional, public and private organizations, used in establishing the total compensation structure.
>
> (b) The compensation levels proposed should reflect a clear understanding of work to be performed and should indicate the capability of the proposed compensation structure to obtain and keep suitably qualified personnel to meet mission objectives. The salary rates or ranges must take into account differences in skills, the complexity of various disciplines, and professional job difficulty. . . .
>
> * * *
>
> (d) Failure to comply with these provisions may constitute sufficient cause to justify rejection of a proposal.

*Id.* at 1673-74 (quoting FAR 52.222-46).[10]

In connection with its evaluation of each offeror's PECP, GSA provided its evaluation team with "responsibility review guidance." *See* AR Tab 46 at 821-22. The guidance consisted of the following two questions:

[***]

*Id.* at 822. In its responsibility determination report, GSA included a table with a column indicating that each offeror selected for award submitted a PECP and that each PECP received a "Pass" from the evaluation team. *Id.* at 828-30. GSA also included the following statement:

> The contracting team evaluated the offeror[s'] PECP[s], as described in RFP Section L.5.6.1 and FAR 52.222-46. The evaluation included an assessment of the offeror[s'] ability to provide uninterrupted high-quality work, considering the realism of the proposed professional compensation and its impact upon recruiting and retention. Specifically, the team reviewed the PECPs to verify offerors were providing a sufficient and realistic benefits package including [***] benefits in the areas of retirement, insurance, bonus, leave, flexible working arrangements, or other. The contracting team concluded that each top 100 offeror would obtain and keep a high-quality workforce for contract performance.

*Id.* at 819.

[10] Paragraph (c) of FAR 52.222-46 is set forth above as the first paragraph in Section L.5.6.1 of the RFP.

This record does not show that GSA conducted the required PECP evaluation. As noted above, the RFP required that each offeror submit a PECP that addressed "salaries and fringe benefits for their professional employees," AR Tab 27 at 1673, and stated that GSA would evaluate the PECPs in accordance with FAR 52.222-46, *see id.* 1687. Yet, aside from a conclusory statement that the PECPs were evaluated in accordance with FAR 52.222-46 and a table indicating that each offeror's PECP passed the evaluation, the record does not contain any indication that GSA conducted such an evaluation. *See CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 378 (2010) (finding that "there is no indication the Army conducted the analysis required by FAR [] 52.222-46" and as such "[t]he Army's failure to comply with the clause constituted a departure from the evaluation criteria . . . [and is] a violation of both the FAR and the Competition in Contracting Act"). While the record shows that GSA considered each offeror's proposed fringe benefits, it is devoid of any indication that GSA considered each offeror's proposed salaries. *See CSC Gov't Sols., LLC v. United States*, 129 Fed. Cl. 416, 432 (2016) (stating that FAR 52.222-46 requires the procuring agency to "conduct a rational analysis of the realism of the offerors' proposed salaries with regard to program continuity, retention, and 'uninterrupted high-quality work'" (quoting *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1339 (Fed. Cir. 2000))).[11] Further, by reducing its analysis of the PECPs to verifying that each offeror included a specific quantity of certain types of fringe benefits, GSA failed to provide any analysis of whether and how the identified benefits contribute to a compensation plan that "reflects a sound management approach and understanding of the contract requirements" and that "provide[s] uninterrupted high-quality work." Instead, GSA simply restates the FAR 52.222-46 requirements and concludes that "each top 100 offeror would obtain and keep a high-quality workforce for contract performance." AR Tab 46 at 819. Because the record lacks any explanation or supporting documentation regarding GSA's PECP evaluation, this conclusion lacks a rational basis. *See Golden IT, LLC*, 177 Fed. Cl. at 136 (recognizing that an agency violates the APA where its "findings or decisions are conclusory or unexplained in the administrative record" because "the APA requires the government to show its work" (citations omitted)).

Furthermore, GSA's PECP evaluation imposed an unstated evaluation criterion with respect to its evaluation of the offerors' proposed fringe benefits. An agency imposes an unstated evaluation criterion when it "use[s] a significantly different basis in evaluating the proposals than was disclosed." *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024) (quoting *Wellpoint Mil. Care Corp. v. United States*, 144 Fed. Cl. 392, 404 (2019), *aff'd*, 953 F.3d 1373 (Fed. Cir. 2020)). In this case, GSA informed the offerors that the basis for evaluating their PECPs would be the evaluation scheme set forth in FAR 52.222-46. *See* AR Tab 27 at 1673-74, 1687. This provision requires that offerors submit "a total compensation plan setting forth salaries and fringe benefits," FAR 52.222-46(a), and it requires that GSA "evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements," *id.* The evaluation must "include an assessment of the offeror's ability to provide uninterrupted high-quality work," *id.*, and the proposed compensation must be considered "in terms of its impact

[11] One recognized method to satisfy this requirement is to evaluate proposed direct labor rates. *See Abacus Tech. Corp. v. United States*, 164 Fed. Cl. 199, 218-20 (2023) (finding that the government satisfied the requirements of FAR 52.222-46 by comparing proposed labor rates to comparative data sources). Regardless of the methodology used by GSA to evaluate each offeror's PECP, GSA's evaluation must consider each offeror's proposed salaries *and* fringe benefits. *See* FAR 52.222-46(a).

upon recruiting and retention, its realism, and its consistency with a total plan for compensation," *id.* Here, instead of evaluating the offerors' proposed fringe benefits under this scheme, GSA applied an unstated criterion by requiring each offeror's plan to include [***] fringe benefits from an enumerated list. AR Tab 46 at 819; *see also id.* at 822 ("Did the offeror identify incentives in the [PECP] that included [***]?"). Critically, neither the [***] nor [***] were disclosed in the RFP. By evaluating each offeror's proposed fringe benefits on this basis, GSA imposed an unstated evaluation criterion. *See Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 651 (2014) (finding an unstated evaluation criterion when proposals were evaluated based on the number of test types listed and such evaluation factor was not disclosed).

The Court is not persuaded by the government's arguments in support of GSA's PECP evaluation. First, the government contends that the protesters' challenges to GSA's PECP evaluation "must fail because GSA evaluated PECP as part of overall responsibility and GSA has broad discretion in evaluating responsibility." [ECF 86] at 54; *see id.* at 74-75, 93-94. According to the government, "[t]o assess responsibility, GSA must only look to the general compensation practices to determine whether an offeror is responsible." *Id.* at 59; *see id.* at 75, 94. However, simply placing the PECP requirement under the responsibility section of the RFP does not insulate GSA from having to comply with the requirements of FAR 52.222-46. *See CSC Gov't Sols., LLC*, 129 Fed. Cl. at 432 (stating that "based on the text of [FAR 52.222-46], the procuring agency must conduct a rational analysis of the realism of the offerors' proposed salaries with regard to program continuity, retention, and 'uninterrupted high-quality work'" (quoting *OMV Med., Inc.*, 219 F.3d at 1339)).

Second, the government argues that GSA's PECP evaluation was appropriate because the RFP provides that a "more detailed evaluation of PECPs will occur at the task order level—when precise information is available on the pricing and fringe benefit[] plans for the professional employees required to complete an individual task order." [ECF 86] at 60; *see id.* at 75, 95. In support of this argument, the government states that "GSA determined that the best way to evaluate each offeror's ability to provide uninterrupted high-quality [work] prior to the issuance of specific task orders under the IDIQ contracts was to 'address[ ] the offeror's [PECP] methodology for determining salaries and fringe benefits for their professional employees in preparation of future task order requirements[.]'" [ECF 103] at 24 (second, fourth, and fifth alterations in original) (citing AR Tab 27 at 1673). While the government's position is based on language in the RFP, the evaluation approach apparently sought by GSA conflicts with the requirements of the FAR. *Compare* AR Tab 27 at 1673 (requiring offerors to submit a PECP "that *addresses the offeror's methodology for determining salaries and fringe benefits* for their professional employees in preparation of future task order requirements under Polaris" (emphasis added)) *with* FAR 52.222-46(a) (requiring offerors to "submit a total compensation plan *setting forth salaries and fringe benefits proposed* for the professional employees who will work under the contract" (emphasis added)). Modifications to FAR provisions and clauses are prohibited unless authorized by the FAR, FAR 52.104 ("The contracting officer must not modify provisions and clauses unless the FAR authorizes their modification."), and the FAR does not authorize modifications to FAR 52.222-46. Furthermore, the record does not contain an authorized deviation to the FAR 52.222-46 requirements. *See* FAR 1.402 ("Unless precluded by law, executive order, or regulation, deviations from the FAR may be granted as specified in this subpart when necessary to meet the specific needs and requirements of each agency.").

Third, the government contends that the protesters' PECP evaluation arguments are waived because the RFP made clear that GSA would not conduct a cost realism analysis. [ECF 86] at 62 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007));[12] *id.* at 75-76, 95-96. Specifically, the RFP states that "[i]n accordance with GSA Acquisition Letter MV-16-04 dated September 23, 2016, which establishes a class deviation for FAR 15.404-1(d)(2), a cost realism analysis is not required for the establishment of the Polaris GWAC." AR Tab 27 at 1687. The government is correct that incorporation of GSA Acquisition Letter MV-16-04 eliminates a requirement to conduct a cost realism analysis at the IDIQ level. *See id.* (GSA Acquisition Letter MV-16-04 stating that "[c]ost realism analyses are not required when establishing multiple-award [IDIQ] contracts" and "[c]ost realism analyses shall be performed at the task-order level for cost-reimbursement orders"); *see* AR Tab 80 at 3. However, the government conflates cost realism and compensation realism. As defined by the FAR, a "[c]ost realism analysis is the process of . . . evaluating specific elements of each offeror's proposed cost estimate[.]" FAR 15.404-1(d)(1); *see also Agile Def., Inc. v. United States*, 959 F.3d 1379, 1384 (Fed. Cir. 2020) (stating that "cost realism generally addresses whether a cost estimate is too low" (quoting *First Enter. v. United States*, 61 Fed. Cl. 109, 123 (2004))). On the other hand, a compensation realism analysis involves evaluating the "realism" of an offeror's proposed professional compensation. FAR 52.222-46(a) ("The Government will evaluate the [PECP] . . . [and] [t]he professional compensation proposed will be considered in terms of . . . its realism[.]"); *see also ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 782-83 (2022) (stating that a compensation realism analysis "involves only 'evaluat[ing] whether a[n offeror's] proposed compensation is too low'" (alterations in *ENGlobal Gov't Servs., Inc.* and emphasis omitted) (quoting *Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1346 (Fed. Cir. 2020))). Because GSA was obligated by the RFP to conduct a compensation realism analysis under FAR 52.222-46, the protesters' arguments are not waived.

GenceTek, DevTech, and BLJV have shown that GSA failed to conduct a proper PECP evaluation under the RFP. However, to succeed in their respective protests, they must also demonstrate that they were prejudiced by GSA's error. To establish prejudice, a protester must demonstrate that "but for the error, it would have had a substantial chance of securing the contract." *Oracle Am., Inc.*, 975 F.3d at 1291 (quoting *Labatt Food Serv., Inc.*, 577 F.3d at 1378). Additionally, "multiple errors might cumulatively establish prejudice[.]" *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010); *see also AccelGov, LLC v. United States*, 174 Fed. Cl. 212, 224 (2024) ("At a minimum, the plaintiff must show that, with the errors corrected, its 'chances of securing the contract' would have increased." (citing *Precision Asset Mgmt. Corp. v. United States,* 125 Fed. Cl. 228, 233 (2016))). Because GenceTek, DevTech, and BLJV each raise additional challenges to GSA's proposal evaluation, the Court will decide whether each has established prejudice after addressing their respective challenges below.

### B. DevTech's Remaining Challenges

[12] Under *Blue & Gold Fleet, L.P. v. United States*, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest[.] 492 F.3d at 1313.

DevTech claims that GSA's "evaluation was arbitrary, capricious, and contrary to law because several awardees failed to meet material [RFP] requirements in two critical respects." [ECF 71-1] at 14. First, DevTech argues that "several awardees failed to provide executed SF 30 acknowledgments for Amendments [0008 and 0012]."[13] *Id.* DevTech contends that the RFP "required strict compliance with amendment acknowledgments," *id.*, and that "[e]ach of these amendments was material . . . [because they] went to the enforceability and legality of the offers themselves," *id.* at 16. According to DevTech, GSA "nonetheless permitted awardees to proceed without acknowledgments, in violation of the [RFP] and binding FAR provisions." *Id.* Second, DevTech argues that GSA "permitted awardees to supplement their proposals by providing missing financial statements required under Section L.5.6.3 of the [RFP]." *Id.* at 14. DevTech contends that "[d]espite this requirement, [GSA] issued clarification requests instructing awardees to provide the missing documents when their proposals omitted financial statements." *Id.* at 17. DevTech posits that "[b]y failing to enforce the requirement to submit financial statements at the time of proposal submission, [GSA] arbitrarily excused noncompliance with material [RFP] terms[, which] permitted awardees to cure proposal deficiencies after the deadline to submit proposals." *Id.*[14]

The government responds that "DevTech is asking the court to set aside the awards to numerous awardees based on their supposed failure to acknowledge the amendments or their late acknowledgement." [ECF 86] at 90. The government posits that "it was within GSA's discretion to waive the formal acknowledgment requirement for these amendments because they were not material." *Id.* The government asserts that the amendments "did not substantively change the requirements of any of the proposals [and] DevTech does not point to any part of the [RFP] that indicates that acknowledgement of the amendments requires strict compliance." *Id.* (citing *GovWave, LLC v. United States*, 175 Fed. Cl. 564, 640 (2025), *appeal docketed*, No. 25-1656 (Fed. Cir. Apr. 17, 2025)). Regarding the missing financial statements, the government argues that "the RFP specifically gave GSA latitude to seek additional or clarifying information related to financial resources." [ECF 86] at 91. Under the RFP, the government contends that "GSA was not required to find a vendor not responsible . . . simply because certain responsibility documents were not provided by the due date for proposal[s]." *Id.* at 92.

The Court finds that the RFP requirements to acknowledge amendments and submit financial statements are material requirements and that GSA arbitrarily administered them. "To be acceptable, a proposal in a procurement 'must represent an offer to provide the exact thing called for in the [RFP], so that acceptance of the proposal will bind the contractor in accordance

[13] DevTech also argues that an additional apparent awardee, [***], did not submit an acknowledgment to Amendment 0008 and another apparent awardee, [***], did not submit an acknowledgment to Amendment 0011. [ECF 71-1] at 15. DevTech withdrew its argument regarding [***] Amendment 0008 submission in its reply to the government's cross-MJAR "based on the information in [GSA's] corrected [administrative record]." [ECF 93] at 10 n.4. DevTech also withdrew its argument regarding [***] alleged failure to submit Amendment 0011 in its reply to the government's cross-MJAR because "[t]he government [] supplemented the record with documents showing [***] in fact submitted the acknowledgment of this amendment on time." *Id.* at 12 n.5.

[14] DevTech also argues that GSA "failed to reasonably evaluate offerors' indirect rates for reasonableness in accordance with the [RFP]." [ECF 71-1] at 26 (emphasis and capitalization omitted). DevTech withdrew this protest ground in its reply to the government's cross-MJAR "based on information provided in the corrected [administrative record]." [ECF 93] at 6 n.1.

with the material terms and conditions of the [RFP].'" *Bus. Integra, Inc. v. United States*, 116 Fed. Cl. 328, 333 (2014) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). If a proposal fails to conform to the solicitation's material terms, the proposal cannot receive a contract award. *Analysis, Stud., & Training Int'l, LLC v. United States*, 175 Fed. Cl. 523, 531 (2025) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996)). Solicitation terms are material when the term "is express in the solicitation, and [] serves a substantive purpose." *Veteran Elevated Sols., LLC v. United States*, 177 Fed. Cl. 402, 413 (2025) (quoting *Superior Optical Labs, Inc. v. United States*, 173 Fed. Cl. 243, 254 (2024)). A substantive purpose is served if the term is "important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." *DigiFlight, Inc. v. United States*, 150 Fed. Cl. 650, 657 (2020) (quoting *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 506 (2019)), *appeal dismissed*, No. 21-1486, 2021 WL 6337494 (Fed. Cir. Sept. 22, 2021).

The requirement to acknowledge RFP amendments is material. Section L.5.1.1 of the RFP states that "[i]f any amendments to the [RFP] are issued, the offeror must acknowledge each amendment number and date in Block 14 of the SF33 or complete Blocks 8 and 15 of the SF30 for each amendment." AR Tab 27 at 1651. The RFP also incorporates FAR 52.215-1 Instructions to Offerors – Competitive Acquisition (NOV 2021) by reference, AR Tab 27 at 1647, which states that "[o]fferors shall acknowledge receipt of any amendment to this solicitation by the date and time specified in the amendment(s)," FAR 52.215-1(b). Additionally, the acceptability review criteria in Section M.4.2 of the RFP states that the offeror's signed SF33 "will be evaluated to determine whether the requested proposal submission information meets the criteria for the information requested in Section L.5.1 and is current, accurate, and complete." AR Tab 27 at 1683. Section M.4.2 further advises that "[a]ny proposal which does not meet the requirements of the acceptability review will be removed from consideration for award." *Id.* This qualifies as an express requirement. Additionally, the requirement to acknowledge RFP amendments serves a substantive purpose because it is binding on the offerors. *See DigiFlight, Inc.*, 150 Fed. Cl. at 657; *see also Analysis, Stud., & Training Int'l, LLC*, 175 Fed. Cl. at 533 ("[O]ur caselaw indicates that a term can be material simply by being binding."). Indeed, the RFP states, without qualification, that offerors "must acknowledge each amendment[.]" AR Tab 27 at 1651. It further warns offerors that failure to meet this requirement will result in removal from consideration for award. *See id.* at 1683. This substantive purpose, coupled with being an express requirement, makes the requirement to acknowledge RFP amendments material. *See DigiFlight, Inc.*, 150 Fed. Cl. at 657; *see also Revelations Counseling & Consulting, LLC v. United States*, 180 Fed. Cl. 721, 734 (2026) ("[W]hen a solicitation expressly hinges the acceptance or rejection of a proposal on whether it adheres to a particular requirement, that requirement is, by definition, material.").[15]

[15] The government relies on *GovWave, LLC* for the proposition that DevTech needs to point to a section of the RFP that makes the requirement to acknowledge RFP amendments a "strict compliance" requirement. [ECF 86] at 90 (citing *GovWave, LLC*, 175 Fed. Cl. at 640). The government's reliance on *GovWave, LLC* for this proposition is misplaced. In the solicitation at issue in *GovWave, LLC*, a "strict compliance requirement" was a defined term which designated specific items throughout the solicitation as "strict compliance requirements" that would "be evaluated for compliance prior to any further evaluation of the [o]fferor['] s proposal." 175 Fed. Cl. at 580. No similar "strict compliance requirement" exists in the instant RFP. *See generally* AR Tab 27.

The requirement to provide financial statements is also material. The RFP states that "[t]o be determined responsible, an offeror must have adequate financial resources to perform the contract, or the ability to obtain them." AR Tab 27 at 1675. It further states that offerors "must submit a GSA Form 527, Contractor's Qualifications and Financial Information, Attachment J.P-5" and provides offerors with instructions on how to fill out the GSA Form 527. *Id.* Importantly, the instructions require offerors to "[s]ubmit [financial] statements for the last two full fiscal years and [an] interim statement for the current year" and advises that offerors "must attach the financial and interim statements rather than write the figures on the GSA Form 527[.]" *Id.* Because the requirement to submit financial statements is express in the RFP and binding on the offerors, it is a material requirement. *See DigiFlight, Inc.*, 150 Fed. Cl. at 657; *Analysis, Stud., & Training Int'l, LLC*, 175 Fed. Cl. at 533.

The record shows that GSA arbitrarily administered the requirement to acknowledge Amendment 0012. GSA issued Amendment 0012 on November 25, 2024. AR Tab 27 at 1584. According to GSA's PSP Amendments and Clarifications In-System Responses Report, five offerors failed to submit a signed Amendment 0012. *See* AR Tab 69 at 11874 (showing a status of RESPONSE_EXPIRED for [***] response to Amendment 0012), 11895 (same for [***] and [***] response to Amendment 0012), 11911 (same for [***] response to Amendment 0012), 11917 (same for [***] response to Amendment 0012). Despite the failure by these offerors to comply with the requirement to acknowledge this RFP amendment, each was listed as an awardee on GSA's notice of award. AR Tab 48 at 1-3, 5. Because these offerors failed to comply with a material RFP requirement, GSA acted arbitrarily by including them on the awardee list. *See Analysis, Stud., & Training Int'l, LLC*, 175 Fed. Cl. at 531 ("A proposal that does not conform to a solicitation's material terms is ineligible for a contract award." (citing *E.W. Bliss Co.*, 77 F.3d at 448)); *see also Revelations Counseling & Consulting, LLC*, 180 Fed. Cl. at 734 ("[A] government agency is bound to adhere to solicitation provisions as written; where a solicitation requires that a non-compliant proposal be excluded from a competition, the agency ordinarily cannot waive the compliance failure.").[16]

The record also shows that GSA arbitrarily used clarifications to remedy non-compliance with the requirement to submit financial statements. During its evaluation of proposals, GSA issued nine clarification requests to offerors informing them that their proposal did not include financial or interim statements as required by the RFP and requesting submission of the same. *See* AR Tab 68 at 939 (clarification request to [***] requesting omitted financial documentation); *id.* at 4914 (clarification request to [***] requesting same); *id.* at 2236 (clarification request to [***] requesting same); *id.* at 9299 (clarification request to [***] requesting same); *id.* at 10589 (clarification request to [***] requesting same); *id.* at 11251 (clarification request to [***] requesting same); *id.* at 11598 (clarification request to [***] requesting same); AR Tab 69 at 11854 (clarification response from [***] providing requested financial documentation); *id.* at 11856 (clarification response from [***] providing same). Eight

---

[16] With respect to Amendment 0008, DevTech argues that "[***] and [***] failed to acknowledge [GSA's] amendment requests for Amendment [0]008." [ECF 71-1] at 15. Although these offerors did not acknowledge Amendment 0008 prior to expiration of their respective proposal's minimum acceptance period, the record shows that these offerors acknowledged Amendment 0008 prior to the notice of contract award. AR Tab 73 at 16-19 ([***] signed Amendment 0008); AR Tab 75 at 33 ([***] signed Amendment 0008).

of the nine offerors responded to the clarification requests by providing the requested financial statements. *See id.* at 11831 (clarification response from [***] providing omitted financial statements); *id.* at 11874 (clarification response from [***] providing omitted financial statements); *id.* at 11909 (clarification response from [***] providing same); *id.* at 11862 (clarification response from [***] providing same); *id.* at 11837 (clarification response from [***] providing same); *id.* at 11887 (clarification response from [***] providing same); *id.* at 11854 (clarification response from [***] providing same); *id.* at 11856 (clarification response from [***] providing same). One offeror, [***], did not respond to GSA's clarification request. *See id.* at 11833 (showing a status of RESPONSE_EXPIRED for [***] response to GSA's May 21, 2024, clarification request). Despite the failure by these offerors to comply with the requirement to submit financial or interim statements with their proposal, each was included on the awardee list in GSA's notice of award. AR Tab 48 at 2-3, 5, 8-10. Because these offerors failed to comply with a material RFP requirement, GSA acted arbitrarily by including them on the list of awardees. *See Analysis, Stud., & Training Int'l, LLC*, 175 Fed. Cl. at 531 (citing *E.W. Bliss Co.*, 77 F.3d at 448)); *Revelations Counseling & Consulting, LLC*, 180 Fed. Cl. at 734. Furthermore, GSA acted arbitrarily by using clarifications to remedy the offeror's non-compliance with this material requirement. *See WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 269 (2021) ("Clarifications are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal." (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018))).[17]

DevTech has shown that GSA arbitrarily enforced the RFP requirements that offerors acknowledge amendments and submit financial statements. It has also shown, as explained in Section III.A, that GSA erred in its PECP evaluation. The Court must now determine whether DevTech was prejudiced by these errors. To prevail in a protest, a protester "must show not only that significant errors occurred in the procurement process, but also that the errors were prejudicial." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed Cir. 1996) (citations omitted)). Instead, a protester must show that "but for the alleged error, there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (alteration in *Allied Tech. Grp., Inc.*) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)). Thus, to demonstrate prejudice, DevTech must show that, but for GSA's errors, it would have had a substantial chance to be ranked within the top 100 and receive an award. Based on its claimed score of [***], AR Tab 68 at 3543, at *5, DevTech was ranked [***], AR Tab 71 at 12456. The Court finds that DevTech has established prejudice.

[17] The government argues that "the RFP specifically gave GSA latitude to seek additional or clarifying information related to financial resources." [ECF 86] at 91. To advance this argument, the government relies on the following statement in the RFP: "The GWAC [procuring contracting officer] may provide the information to GSA financial analysts who may contact the offeror after their initial financial review for clarification or additional information, if necessary." AR Tab 27 at 1675 (emphasis omitted). The government is correct that this permits GSA to seek additional and clarifying information relating to the offeror's submitted financial documentation. However, the RFP expressly provides that such contact may only occur "after [GSA's] initial financial review" of the offeror's financial statements. *Id.* Thus, an offeror must first provide the required financial statements to allow GSA to complete the initial financial review before GSA may contact the offeror to obtain additional or clarifying information.

With respect to GSA's arbitrary enforcement of the RFP requirements, DevTech argues that "[t]hese errors are . . . prejudicial[] because the [RFP] required strict compliance" and GSA's "failure to enforce these requirements rendered several awardees' proposals ineligible for award[.]" [ECF 71-1] at 14. DevTech asserts that "[b]ut for [these] error[s], non-compliant awardees would have been excluded from the competition and DevTech would have had a substantial chance of award." *Id.* at 17; *see also id.* at 16 ("Had [GSA] enforced the amendment acknowledgment requirement, multiple awardees would have been rendered ineligible, substantially improving DevTech's competitive position."). According to DevTech, GSA arbitrarily selected for award five offerors that failed to acknowledge Amendment 0012, *id.* at 15 (listing offerors), and nine offerors that failed to provide financial statements with their proposals, *id.* at 17 (listing offerors). Together, correction of these errors would remove fourteen apparent awardees from the awardee list. DevTech has also shown that GSA erred in its PECP evaluation. DevTech argues that "[h]ad [GSA] conducted a proper professional employee compensation analysis, it would have found that several of the awardees['] proposed direct labor and/or fringe benefit rates were far too low to attract and retain the necessary professional employees, which would have made them ineligible for award." [ECF 71-1] at 21. In support of its position, DevTech conducted an analysis of the "burdened rates for all the years for each awardee, to establish cumulative proposed rates for each awardee, and sorted them from highest cost/price to lowest cost/price." *Id.* DevTech posits that "[b]ecause [GSA] did not conduct any analysis . . ., it is impossible to tell with precision what results such an analysis would have produced." *Id.* at 26. Yet, DevTech maintains that its "data points illustrate that the awardees' proposed rates for many labor categories were widely dispersed, and that even considering this wide dispersal, many awardees offered rates that were statistical outliers on the low end." *Id.* at 23-24. DevTech concludes that "[t]he information available to the Court shows that there are many awardees who proposed extremely low direct labor and fringe benefits rates compared to the rest of the awardees," *id.* at 26, and that "there is at least a substantial chance or reasonable likelihood that 22 or more awardees would be disqualified from the competition," *id.*; *see also* [ECF 71-2] at 6-22 (listing offerors that proposed noticeably lower labor rates). Given that DevTech was ranked [***] and has shown that the correction of GSA's errors, when combined, could potentially remove thirty-six apparent awardees, the Court finds that, but for GSA's errors, DevTech would have had substantial chance to enter the top 100 and receive an award.[18]

### C. GenceTek's Remaining Challenge

GenceTek argues that GSA's decision to deduct 5,000 ORA points from its claimed score "was arbitrary, capricious, and unreasonable because [GSA] misinterpreted the ambiguous ORA requirements." [ECF 70] at 24. GenceTek contends that the RFP allowed a JV with proposed subcontractors to satisfy the ORA requirement

> by either submitting an example of a business arrangement where members of a [JV] previously performed together "on a contract or order as a [JV]," or by submitting an example of a business arrangement where ["]members of a [JV] previously performed

[18] The Court does not adopt or validate DevTech's analysis or methodology nor does the Court suggest that such an analysis is required or suitable for the purposes of complying with the FAR 52.222-46 requirements.

> together with one member as a prime contractor and the other member(s) as a subcontractor."

*Id.* at 27 (emphasis omitted) (quoting AR Tab 23 at 1520-21). GenceTek further contends:

> Any other interpretation of [the ORA requirement]—including [GSA's] apparent interpretation that the only way to satisfy the business arrangement requirement was by providing an example of a contract where all members of a [JV] have previously performed together on a contract or order as a [JV]—is unreasonable and unsupported by the plain language of the [RFP].

*Id.* (emphasis omitted). GenceTek also argues that "[t]o the extent there is an ambiguity in the [RFP], the ambiguity is latent" because an offeror in its position could not satisfy the second condition of item 4 in Section L.5.5.1. *Id.* n.2 (citation omitted). Specifically, GenceTek alleges that a JV with proposed subcontractors who chooses to satisfy the condition of item 2 with 2c "necessarily could not satisfy [the second condition of item 4], since it would not have previously performed as a JV" and that GSA "should have recognized that . . . [the second condition of item 4] applied only if the offering JV satisfied 'the condition of item 2' by meeting [2a] . . . or [2b]" [ECF 92] at 17.

The government asserts that "GenceTek's argument is based on the premise that the RFP permitted two alternative options for providing that its business arrangements met the terms of the RFP[, and that,] [t]o the contrary, the RFP created a two-part test that GenceTek failed to meet." [ECF 86] at 79. According to the government, GenceTek's ORA submission did not meet the second part of the test, *id.* at 81, which required that "the business arrangement for a JV with subcontractors [] be either [with GenceTek] itself ('the offering [JV]') or a 'JV composed of the same members as the offering JV,'" *id.* at 82 (citing AR Tab 27 at 1672-73).

The Court finds that GSA properly deducted ORA points from GenceTek's claimed score. "Interpretation of a solicitation term "begin[s] with the plain language of the document [and] [i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain meaning." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004)). When interpreting a solicitation term, a court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.* (emphasis omitted) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353).

Under Section L.5.5.1, the RFP required that "the offeror [] identify if it has previously performed in the same business arrangement as proposed." AR Tab 27 at 1672. The RFP further stated that "[s]coring for this [ORA] element is only available for demonstrating that the offeror has previously performed in the proposed business arrangement." *Id.* at 1673. For the purposes of the ORA evaluation factor, the RFP defined "business arrangement" as "(1) an individual company (not proposing as part of a [JV] or with proposed subcontractor(s)), (2) a [JV] (including a mentor-protégé [JV]), (3) a prime contractor and its proposed subcontractor(s), or (4) a [JV] (including a mentor-protégé [JV]) and its proposed subcontractor(s)." *Id.* The RFP

stated that "[a] business arrangement is considered to have previously performed in the same business arrangement" if it meets the following conditions:

> 1. An individual company (not proposing as part of a [JV] or with a proposed subcontractor(s)) has previously performed on a contract or order as itself, or
>
> 2. For offers from a [JV] (with no proposed subcontractors):
>
>     a. A [JV] has previously performed on a contract or order, or
>
>     b. All members of a [JV] have previously performed together on a contract or order as a [JV], or
>
>     c. All members of a [JV] have previously performed together on a contract or order with one member as the prime contractor and the other member(s) as a subcontractor, or
>
>     d. All members of a [JV] have previously performed together on an order as a multiple award schedule contractor team arrangement, or
>
> 3. Each proposed subcontractor has previously performed on a contract or order as a subcontractor to the offering prime contractor. This may be on separate contracts or orders.
>
> 4. For offers from a [JV] with proposed subcontractors, the condition of item 2 must be met and each proposed subcontractor has previously performed on a contract or order as a subcontractor to (i) the offering [JV] or (ii) a [JV] composed of the same members as the offering [JV].
>
> No additional verification is required for an individual company offering as itself.
>
> Previous performance for [JVs], or a prime contractor with a proposed subcontractor, must submit the following for verification:
>
> 1. The award form for the contract or order for which the work was performed, and
>
> 2. Evidence of the business arrangement such as:
>
>     a. a [JV] agreement that identifies all members, or

b. a copy of the subcontract(s)

*Id.* at 1672-73.

GenceTek submitted a timely proposal, *see* AR Tab 68 at 5810, at *1, claiming a total score of [***] points, *id.* at 5585, *6. At the time of proposal submission, GenceTek was an SBA mentor-protégé JV between TekSynap Corporation (mentor) and SecuriGence, LLC (protégé).[19] *Id.* GenceTek's proposal included [***] as a proposed subcontractor. *Id.* Thus, under Section L.5.5.1, GenceTek's proposal was "an offer[] from a [JV] with proposed subcontractors," which was required to meet the conditions under item 4 to show that it "previously performed in the same business arrangement." AR Tab 27 at 1672-73. To verify the business arrangement, GenceTek provided two subcontract agreements, AR Tab 68 at 5798, 5800, and a task order, *id.* at 5799. One of the subcontract agreements showed SecuriGence, LLC performing as the prime contractor and TekSynap Corporation performing as the subcontractor. AR Tab 68 at 5798, *1. The other subcontract agreement showed TekSynap Corporation performing as the prime contractor and SecuriGence, LLC performing as the subcontractor. *Id.* at 5800, at *1. The task order was between TekSynap Corporation as the prime contractor and [***] as the subcontractor. *Id.* at 5799, at *1. The task order and second subcontract agreement both support TekSynap Corporation's prime contract with the Defense Logistics Agency ("DLA"). *See id.* at 5799, at *1; *id.* at 5800, at *1.

During its evaluation of GenceTek's ORA submission, the GSA evaluator recommended deducting 5,000 points based on a determination that GenceTek's submission did not "meet previous performance for JV members" because the task order provided "from TekSynap to [***] . . . would need to be from the []JV entity to [***]." AR Tab 45 at 809. GSA issued a clarification to GenceTek on March 7, 2024, regarding its ORA submission. *See* AR Tab 69 at 11933. GSA's clarification asked the following question: "For the claimed [ORA] and the relationship with [***], were the award form for the contract or order for which work was performed and evidence of the business arrangement submitted as required by [Section] L.5.5.1?" AR Tab 68 at 5607. GenceTek responded on March 13, 2024, stating "[y]es, the award form for the contract or order for which the work was performed and evidence of the business arrangement [was] submitted as required by [Section] L.5.5.1" and that "[a]ll three companies, TekSynap and Securi[G]ence . . ., and our subcontractor [***] are performing on the [] task order under the [DLA] contract." AR Tab 69 at 11933. In the evaluation summary, the SSA reviewed GenceTek's response to the clarification and deducted 5,000 ORA points from its claimed score because GenceTek's proposal contains "[n]o evidence of previous performance by [***] as a subcontractor to GenceTek or a JV composed of the same members." AR Tab 45 at 264. This point deduction reduced GenceTek's score to [***], which placed it outside the top 100 highest scoring proposals. *Id.* Therefore, GSA stopped evaluating GenceTek's proposal. *Id.* GenceTek's debriefing largely reiterated the SSA's conclusion in its evaluation summary. *Compare id. with* AR Tab 68 at 5815, at *3.

GSA properly deducted 5,000 ORA points from GenceTek's claimed score because it could not verify GenceTek's business arrangement in accordance with the RFP requirements.

[19] Following proposal submission, [***].

For an offer from a JV with proposed subcontractors to earn claimed ORA points, item 4 required that "the condition of item 2 must be met *and* [that] each proposed subcontractor [must have] previously performed on a contract or order as a subcontractor to (i) the offering [JV] or (ii) a [JV] composed of the same members as the offering [JV]." AR Tab 27 at 1673 (emphasis added). This requirement uses the word "and" to include two applicable conditions. *See Prescient, Inc. v. United States*, 125 Fed. Cl. 475, 490 (2016) ("The usual meaning of the word 'and' . . . is conjunctive, and 'unless' the context dictates otherwise, the 'and' is presumed to be used in its ordinary sense[.]" (quoting *Reese Bros. v. United States*, 447 F.3d 229, 235-36 (3d Cir. 2006)). Under the first condition of item 4, the offeror was required under item 2 to submit documentation showing that the proposed JV members had "previously performed together" on a contract or order. AR Tab 27 at 1672. GenceTek satisfied this requirement by providing the subcontract agreements showing that TekSynap Corporation and SecuriGence, LLC had previously performed together in a prime contractor/subcontractor relationship in accordance with item 2c. *See* AR Tab 68 at 5798, *1; *id.* at 5800, at *1. For the second condition of item 4, the offeror was required to provide documentation showing that its proposed subcontractor previously performed on a contract or order as a subcontractor to the offering JV or a JV composed of the same members as the offering JV. AR Tab 27 at 1673. GSA determined that GenceTek did not meet this requirement because it failed to provide "evidence of previous performance by [***] as a subcontractor to GenceTek or a JV composed of the same members [as GenceTek]." AR Tab 45 at 264. This conclusion is supported by the plain language of the RFP.

GenceTek contends that the RFP contains a latent ambiguity because satisfying the first condition of item 4 using item 2c makes it impossible to satisfy the second condition of item 4. *See* [ECF 92] at 17-18. In other words, GenceTek argues that if the offering JV members had not previously performed on a contract or order as a JV (and instead have performed together as a prime contractor and subcontractor under item 2c), then it would be impossible for such offering JV to show that its proposed subcontractor had previously performed on a contract or order as a subcontractor to it because no JV entity previously existed for the purpose of entering a subcontract agreement. *See id.* Therefore, GenceTek reasons that GSA "should have recognized that . . . [the second condition of item 4] applied only if the offering JV satisfied 'the condition of item 2' by meeting [2a] . . . or [2b.]" [ECF 92] at 17. This argument is unpersuasive. The plain language of the RFP requires that a JV with proposed subcontractors satisfy *both* conditions set forth in item 4. The fact that satisfying the first condition of item 4 using item 2c makes it impossible to satisfy the second condition of item 4 does not result in an ambiguity.[20] It simply demonstrates that ORA points were not available to offering JVs with proposed subcontractors where such subcontractors had not previously performed as a subcontractor to the offering JV or a JV composed of the same members. The RFP explicitly states that "[s]coring for this element is *only* available for demonstrating that the offeror has previously performed in the proposed

[20] Even if the Court were to find this requirement ambiguous, it would be patent. A reasonable contractor would be on notice that it could not satisfy both conditions of item 4 and would be obligated to challenge the facial inconsistency before proposal submission. *See K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 722 (Fed. Cir. 2018) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice[.]" (quoting *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000)); *Per Aarsleff A/S*, 829 F.3d at 1313 ("A patent defect triggers the obligation to challenge the solicitation language and failure to do so generally constitutes waiver." (citation omitted)).

business arrangement." AR Tab 27 at 1673 (emphasis added); *see also id.* at 1672 (requiring that the offeror "identify if it has previously performed in the *same* business arrangement as proposed" (emphasis added)). Here, GenceTek is proposing a business arrangement as a JV with proposed subcontractors. Therefore, to be entitled to ORA points, GenceTek was required to demonstrate that it previously performed as a JV with its proposed subcontractors. Because GenceTek's verification documentation did not make this showing, GSA properly deducted its claimed 5,000 points under its ORA submission.[21]

While GenceTek has not shown that GSA erred in its deduction of points due to GenceTek's proposed business arrangement, GenceTek has shown that GSA erred in its PECP evaluation, as explained in Section III.A. Therefore, the Court must now determine whether it was prejudiced by this error. To prevail in a protest, a protester "must show not only that significant errors occurred in the procurement process, but also that the errors were prejudicial." *Advanced Data Concepts, Inc.*, 216 F.3d at 1057. "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data Gen. Corp.*, 78 F.3d at 1562 (citations omitted)). Instead, a protester must show that "but for the alleged error, there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration." *Allied Tech. Grp., Inc.*, 649 F.3d at 1326 (alteration in *Allied Tech. Grp., Inc.*) (quoting *Statistica, Inc.*, 102 F.3d at 1581). Thus, to show prejudice, GenceTek must show that, but for GSA's failure to properly analyze each of the top 100 offeror's PECPs, it would have had a substantial chance to be ranked within the top 100 and receive an award. Based on its evaluated score of [***], AR Tab 68 at 5815, at *3, GenceTek was ranked [***], AR Tab 71 at 12456. The Court finds that GenceTek has not established prejudice because its prejudice argument is largely based on presumptions and fails to sufficiently show that it was in the zone of active consideration.

GenceTek argues that GSA's "flawed and unstated evaluation scheme resulted in a failure by [GSA] to identify unrealistic compensation proposed by the awardees [and that] [i]f such widespread unrealistic compensation had been properly identified, there is a substantial chance GenceTek would be in a position to receive an award." [ECF 70] at 24. According to GenceTek, if "[p]roperly conducted, [a FAR 52.222-46] analysis could have rendered numerous apparent awardees non-responsible based on unrealistic compensation, reshaping the top-100 list and creating a substantial chance for GenceTek to receive award." [ECF 92] at 16. In support of its argument, GenceTek identifies three examples of offerors that "proposed significantly lower labor rates compared to other offerors." [ECF 70] at 21. Given that GenceTek was ranked [***], and considering its arguments and supporting data, the Court cannot find that, but for GSA's failure to properly analyze each offeror's PECP, GenceTek would have had substantial chance to

---

[21] GenceTek also argues that it was treated unequally because GSA "turned a blind eye to significant defects in other awardees' ORA submissions" such as "accept[ing] potentially fabricated subcontracts, or subcontracts having nothing to do with performance under a prime contract" and "accept[ing] ORA submissions that did not evidence a prior business arrangement[.]" [ECF 70] at 24. Although GenceTek's allegations may raise valid concerns, they do not demonstrate unequal treatment. None of the allegations show that GSA "unreasonably downgraded [GenceTek's] proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or that GSA "inconsistently applied objective solicitation requirements between [GenceTek] and other offerors[.]" *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citations omitted). Critically, GenceTek does not identify any apparent awardee that received ORA points as a JV with proposed subcontractors but failed to satisfy the second condition of item 4.

enter the top 100 and receive an award. Doing so would require the Court to presume that a significant number of apparent awardees will be found non-responsible based on their PECPs, and the Court cannot presume prejudice. *See Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) ("[T]here is no starting point of presumed prejudice."). Furthermore, while these generic arguments establish a possibility that GenceTek could receive an award depending on the outcome of a proper PECP evaluation, a mere possibility of award is inadequate to show prejudice. *See Data Gen. Corp.*, 78 F.3d at 1562 ("[A] showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice.").

### D. BLJV's Remaining Challenges

BLJV argues that "GSA's decision to decrement BLJV's [ORA] points . . . was arbitrary and capricious . . . [because] the decision reflects [an] imposition of an unreasonable and unstated evaluation criterion: that [GSA] would permit offerors to rely on affiliates in connection with the ORA only if the [MRCL] contained the word 'ORA.'" [ECF 74] at 34 (emphasis omitted). BLJV contends that the RFP required an offeror "to use the MRCL if it intended to rely on an affiliate in connection with [RFP] Section L.5.2, 'Relevant Experience,' or Section L.5.4[,] 'Systems, Certifications, and Clearances'" but "did not require an offeror to represent in the MRCL its intention to use an affiliate in connection with [Section] L.5.5, 'Risk Assessment.'" *Id.* at 35 (emphasis omitted). BLJV further contends that "in its effort to resolve internal disagreement or a perceived ambiguity in the [RFP] . . ., GSA settled on . . . [an] unstated criterion that an offeror could rely on affiliates for [] ORA if the offeror referenced [] ORA in the MRCL." *Id.* at 38 (emphasis omitted). BLJV also argues "that GSA sought, through its internal deliberations, to resolve a latent ambiguity in the [RFP] or otherwise decided to change its stated requirements" and that "GSA was required to announce the change or clarified interpretation and to solicit revised proposals so that offerors could compete intelligently." *Id.* (citations and emphasis omitted).

The government contends that "GSA did not validate ORA points claimed by [BLJV] because its documents did not meet RFP requirements for either of the two methods available for validation: (1) evidence of prior work together, or (2) a MRCL." [ECF 86] at 47. The government contends that "when claiming any proposal element via a MRCL, the element claimed must be identified in the MRCL" and, because BLJV's "MRCL did not 'clearly and specifically' list ORA as a proposal element . . . [, its] proposal did not demonstrate the required information [] to receive ORA points." *Id.* at 50. The government also refutes BLJV's argument that GSA applied an unstated evaluation criterion by "only award[ing] ORA points . . . when the MRCL specifically stated ORA as a proposal element," *id.* at 50, because "ORA is an 'applicable proposal element' and therefore falls within [Section] L.5.1.4's requirements," even though Section L.5.1.4 does not specifically mention ORA, *id.* at 51.

The Court finds that the plain language of the RFP does not allow offerors to claim points under the ORA proposal element based on a MRCL. Interpretation of a solicitation term "begin[s] with the plain language of the document [and] [i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain meaning." *Per Aarsleff A/S*, 829 F.3d at 1309 (emphasis omitted) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353). When

interpreting a solicitation term, a court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.* (emphasis omitted) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353).

Section L.5.1.4 of the RFP states that "GSA will allow an offeror to take credit for relevant experience project(s), system(s), certification(s), or clearance(s) from a parent company, affiliate, division, and/or subsidiary so long as there is a meaningful relationship to the offeror and commitment letters are provided to [GSA]." AR Tab 27 at 1657. The RFP also states that

> a 'meaningful relationship' exists within a corporate structure when at least one of the following conditions exists:
>
> - An entity is a wholly owned subsidiary of a parent organization
> - An entity is a parent of a wholly owned subsidiary
> - An entity operates under a single internal operational unit
> - An entity operates under a consolidated accounting system
> - An entity operates under a consolidated purchasing system
> - An entity operates under a consolidated human resources or personnel system
> - An entity operates under common policy and corporate guidelines
> - Operating structure between the entities includes internal organizational reporting lines and management chains for 'lines of business' that operate across the formal corporate subsidiaries

*Id.* (emphasis omitted). The RFP instructs that "[f]or each meaningful relationship identified for Polaris proposal elements, the offeror must provide a MRCL [in which] . . . [e]ach applicable proposal element must be clearly and specifically identified." *Id.*

BLJV submitted a timely proposal, *see* AR Tab 68 at 1778, at *1, claiming a total score of [***] points, *id.* at 1776, *4. BLJV is an SBA mentor-protégé JV between Business Enabled Acquisition and Technology, LLC ("BEAT, LLC") (mentor) and [***] (protégé). *Id.* at 1832. BLJV's proposal included a MRCL, which identified [***] as an affiliate of Lawelawe Defense, Inc. because both entities are "managed by Lawelawe Management Group, and 100% owned and operated by Native Hawaiian Organization Charity[.]" *Id.* at 1781, *1. The MRCL identified two relevant experience projects as proposal elements based on performance by [***] as the prime contractor. *Id.*, *1-*2. To claim points under the ORA proposal element, BLJV submitted two contract documents: [***] between [***] and the U.S. Department of the Army, *id.* at 1786, and Subcontract No. [***] between [***] and BEAT, LLC, *id.* at 1787. BLJV did not identify ORA as a claimed proposal element in its MRCL. *See generally id.* at 1781.

The record of GSA's evaluation of BLJV's ORA shows that the evaluators had different interpretations of the MRCL requirements. Evaluator 1 noted that BLJV's ORA was "Valid." AR Tab 45 at 785. However, Evaluator 2 noted that BLJV's ORA was "Invalid: Award form and

subk agreement used is for subsidiary [***], not the Polaris offeror member Lawelawe Defense, Inc." *Id.* Evaluator 2 stated that BLJV "appears to be utilizing [a] MRCL." *Id.* Upon further review, GSA "[r]ecommend[ed] deduction of 5,000 points" because the "[a]ward form [is] in the name of [***], which is a subsidiary of the offering JV member Lawelawe Defense, Inc." and the "[***]" *Id.* at 810.

GSA issued a clarification to BLJV on July 9, 2024, regarding its ORA and MRCL submissions. *See* AR Tab 69 at 11934. GSA asked: "For the claimed [ORA,] were the award form for the contract or order for which the work was performed and evidence of the business arrangement submitted as required by [Section] L.5.5.1?" AR Tab 68 at 1822 (emphasis omitted). The clarification also noted that a "[MRCL] is not applicable to [ORA]." *Id.* BLJV responded on July 11, 2024, stating that "[***] and Lawelawe Defense Inc. [], the managing member for the BEAT-LDI LLC JV, are legally affiliated subsidiaries, managed by Lawelawe Management Group, and 100% owned and operated by Native Hawaiian Organization Charity []. Reference [the MRCL] for more information." AR Tab 69 at 11934.

On September 25, 2024, GSA issued an internal memorandum to clarify whether offerors could use a MRCL to claim points under the ORA proposal element. *See* AR Tab 42. The memorandum states the following:

> The Polaris Team has determined that a meaningful relationship is an allowable business arrangement for consideration as a valid member of the offeror's organizational structure (in-part) when conducting pre-award evaluations under [Section] L.5.5.1 ORA, so long as the claimed ORA is included as a proposal element that is clearly and specifically defined in their MRCL per [Section] L.5.1.4.

*Id.* at 209 (emphasis omitted). In the evaluation summary, the SSA reviewed BLJV's response to the clarification and deducted 5,000 ORA points from its claimed score because BLJV's "MRCL d[id] not clearly and specifically identify ORA [] as a proposal element claimed as required by [Section] L.5.1.4." AR Tab 45 at 267. BLJV's debriefing informed BLJV that its "MRCL was [] reviewed and it did not identify ORA as an applicable proposal element" and stated that "there is no language in the [RFP] that allows for affiliated subsidiaries to be used interchangeably with JV members for the purposes of ORA." AR Tab 68 at 1782, at *3.

Contrary to GSA's internal memorandum, the plain language of Section L.5.1.4 of the RFP does not allow offerors to claim ORA points by using a MRCL. In this section, GSA states that it "<u>will</u> allow an offeror to take credit for" the following proposal elements: relevant experience projects, systems, certifications, or clearances. AR Tab 27 at 1657 (emphasis in original). Notably, this list excludes the past performance and ORA proposal elements. *See id.* at 1685-86 (identifying Sections L.5.3 Past Performance and L.5.5 Risk Assessment as proposal elements). To claim credit for a proposal element using a MRCL, this section also requires that the offeror provide a MRCL that identifies "[e]ach applicable proposal element[.]" *Id.* at 1657. When read together, this section informs offerors that they may claim points under any of the listed proposal elements through a MRCL, provided they specifically identify such proposal elements in their MRCL. *See Per Aarsleff A/S*, 829 F.3d at 1309 (stating that when the court

interprets a solicitation term, it "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions" (emphasis omitted) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353)).

Neither BLJV nor the government advance a reasonable interpretation of Section L.5.1.4. *See Per Aarsleff A/S*, 829 F.3d at 1310 ("Solicitation language 'is ambiguous . . . if its language is susceptible to more than one reasonable interpretation.'" (alteration in *Per Aarsleff A/S*) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353)). BLJV's interpretation is that the RFP "did not prohibit reliance on an affiliate in connection with the ORA," [ECF 74] at 33, and that the RFP "did not require an offeror to represent in the MRCL its intention to use an affiliate in connection with [ORA]," *id.* at 35 (emphasis omitted). However, this interpretation conflicts with the plain language of the RFP. While Section L.5.1.4 allows offerors to "take credit" for specific proposal elements by using an affiliate, the specific proposal elements listed in this section do not include ORA. AR Tab 27 at 1657. Furthermore, for an offeror to receive credit for one of the listed proposal elements, the RFP requires that the offeror's MRCL "clearly and specifically" identify the proposal element. *Id.* BLJV's interpretation would essentially render Section L.5.1.4 meaningless. *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 401 (2022) ("[T]he Court must 'interpret the [solicitation] in a manner that gives meaning to all of its provisions and makes sense.'" (second alteration in *G4S Secure Integration LLC*) (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996))). As for the government, its interpretation is that, "[w]hile [Section] L.5.1.4 does not specifically mention ORA, ORA is an 'applicable proposal element' and therefore falls within [Section] L.5.1.4's requirements." [ECF 86] at 51. In other words, the government argues that, despite the fact that Section L.5.1.4 contains a list of proposal elements that offerors may "take credit for" through an affiliate and ORA is not included in that list, offerors may nevertheless claim ORA points through an affiliate if the offeror provides a MRCL that "clearly and specifically" identifies ORA. *See* AR Tab 27 at 1657. While this interpretation enforces the requirement in Section L.5.1.4 that offerors specifically identify the proposal element in the MRCL, it ignores and renders meaningless the list of specific proposal elements that offerors are allowed to take credit for through an affiliate. *See G4S Secure Integration LLC*, 161 Fed. Cl. at 401-02.

Because the plain language of the RFP did not allow offerors to receive credit for the ORA proposal element through a MRCL, GSA applied an unstated evaluation criterion when it permitted offerors to use a MRCL to claim ORA points. Generally, "[a]gencies retain 'great discretion' in determining the scope of a given evaluation factor." *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 219 (2020) (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010)). However, agencies are still required to evaluate proposals and make contract awards based on the criteria stated in the solicitation. *Poplar Point RBBR, LLC*, 147 Fed. Cl. at 219. "To succeed on an unstated evaluation [criteria] claim, an offeror must show the agency 'used a significantly different basis in evaluating the proposals than was disclosed.'" *Samsara Inc.*, 169 Fed. Cl. at 319 (quoting *Wellpoint Mil. Care Corp.*, 144 Fed. Cl. at 404). Here, GSA issued an internal memorandum that allowed offerors to receive credit for ORA "so long as the claimed ORA [wa]s included as a proposal element that [wa]s clearly and specifically defined in [the offeror's] MRCL per [Section] L.5.1.4." AR Tab 42 at 209. By applying this evaluation approach, GSA used a significantly different basis in evaluating whether credit should

be allowed for the ORA proposal element than set forth in the RFP because Section L.5.1.4 does not allow offerors to take credit for the ORA proposal element using a MRCL.[22]

BLJV has shown that GSA erred in its handling of the ORA proposal element and in its failure to conduct a proper PECP evaluation, as explained in Section III.A. The Court must now determine whether BLJV was prejudiced by these errors. To prevail in a protest, a protester "must show not only that significant errors occurred in the procurement process, but also that the errors were prejudicial." *Advanced Data Concepts, Inc.*, 216 F.3d at 1057. "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data Gen. Corp.*, 78 F.3d at 1562 (citations omitted)). Instead, a protester must show that "but for the alleged error, there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration." *Allied Tech. Grp., Inc.*, 649 F.3d at 1326 (alteration in *Allied Tech. Grp., Inc.*) (quoting *Statistica, Inc.*, 102 F.3d at 1581). Thus, to show prejudice, BLJV must show that, but for GSA's errors, it would have had a substantial chance to be ranked within the top 100 and receive an award. Based on its evaluated score of [***], AR Tab 68 at 1782, at *3, BLJV was ranked [***], AR Tab 71 at 12458. The Court finds that BLJV has not established prejudice.

GSA's use of an unstated evaluation criterion did not prejudice BLJV. It argues that "[b]ut for GSA's unreasonable deduction of points, BLJV would have received [***] points and would have been ranked [***] among the awardees." [ECF 74] at 38-39 (citation omitted). However, under the plain language of the RFP, no offeror should have received credit for the ORA proposal element using a MRCL. Thus, GSA's deduction of points from BLJV, while based on an improper rationale, was consistent with the RFP terms. Additionally, while BLJV identifies two other offerors who "relied on an affiliate for purposes of the ORA" and received 5,000 points under ORA, *id.* at 39, removal of these two offerors from the top 100 offerors would not provide BLJV with a substantial chance of award because its proposal was ranked [***]. *See* AR Tab 71 at 12458.

Further, like GenceTek, BLJV's PECP prejudice argument is largely based on presumptions and fails to sufficiently show that it was in the zone of active consideration. BLJV argues that "[h]ad GSA conducted the required analysis, it would have determined that several of the awardees proposed significantly low compensation levels relative to the field." [ECF 74] at 43-44. BLJV points to "[three] glaring examples of awardees whose markedly low proposed

[22] BLJV also argues that it was treated unequally because two other offerors "relied on an affiliate for purposes of the ORA, [and] only BLJV was decremented 5,000 points," [ECF 74] at 39, and that GSA arbitrarily and disparately, *id.*, "ignored BLJV's clarification response and deducted the points at issue," *id.* at 40. These arguments are not persuasive. First, BLJV was not treated unequally because its MRCL did not include ORA as a claimed proposal element and the MRCLs provided by the two referenced offerors did include ORA as a claimed proposal element. *See* AR Tab 68 at 6997, at *1 ([***] MRCL including Section L.5.5.1 ORA as a claimed proposal element); *see id.* at 7618 ([***] MRCL including ORA as a claimed proposal element). Therefore, BLJV's MRCL is substantively distinguishable from the MRCLs submitted by the other two offerors. *See Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). Second, the administrative record demonstrates that GSA did not ignore BLJV's clarification response. GSA's SSA evaluation summary states that "[f]ollowing review of clarification for the claimed [ORA], [BLJV's] submission does not demonstrate previous performance in the same business arrangement . . . [because its] MRCL does not clearly and specifically identify ORA [] as a proposal element claimed as required by [Section] L.5.1.4." AR Tab 45 at 267. This statement demonstrates that GSA considered BLJV's clarification response before deducting the ORA points.

compensation figures are likely to be flagged," *id.* at 44, and states that "[t]hese are but a few of the many examples of awardees whose proposed compensation for professional employees was markedly lower than that of the field of competitors," *id.* at 45. Given that BLJV was ranked [***] and considering its arguments and supporting data, the Court cannot find that, but for GSA's failure to properly analyze each offeror's PECP, it would have had substantial chance to enter the top 100 and receive an award. Doing so would require the Court to presume that a significant number of apparent awardees will be found non-responsible based on their PECPs, and the Court cannot presume prejudice. *See Sys. Stud. & Simulation, Inc.*, 22 F.4th at 998 ("[T]here is no starting point of presumed prejudice."). Furthermore, while these generic arguments establish a possibility that BLJV could receive an award depending on the outcome of a proper PECP evaluation, a mere possibility of award is inadequate to show prejudice. *See Data Gen. Corp.*, 78 F.3d at 1562 ("[A] showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice.").

**E. OM Partners' Challenges**

OM Partners argues that "GSA treated offerors unequally by allowing [***] . . . to clarify its J.P-9 pricing omission with its WOSB submission but refusing to consider OM Partners' WOSB J.P-9 submission." [ECF 65-1] at 17 (emphasis omitted). OM Partners contends that "GSA's treatment of [***] and OM Partners was fundamentally unequal [because] [b]oth offerors had issues with [their] J.P-9 submission, which otherwise would have rendered the proposals unacceptable and ineligible for award" and that "[t]he only distinction between [their] J.P-9 submissions was that OM Partners was unable to transmit any J.P-9 submission to GSA, whereas [***] succeeded in submitting a partially completed J.P-9." *Id.* at 19 (emphasis omitted). OM Partners also argues that "[e]ven without a J.P-9 submission, GSA possessed sufficient information to evaluate [its] price reasonableness" because its "Basis of Estimate [("BOE")] supplied GSA with the essential information required to evaluate its proposal." *Id.* at 23.

The government argues that "OM Partners did not submit [the] required [J.P-9] document by the due date for revised proposals," and that such "failure to submit the form was a material omission." [ECF 86] at 37. According to the government, "the J.P-9 is a form essential for the evaluation of cost/price, which is a material requirement . . . [and] OM Partners' failure to submit this document is fatal to its claim." *Id.* at 38. The government further contends that OM Partners' proposal did not contain "all information necessary to evaluate price even without the required J.P-9." *Id.* at 42. The government asserts that it did not engage in unequal treatment because [***] "included in its proposal all the information necessary to enable GSA to evaluate its cost and price." *Id.* at 43.

The Court finds that GSA unequally treated OM Partners. "An agency decision is [] arbitrary and capricious when it results from unequal treatment of the offerors." *Samsara Inc.*, 169 Fed. Cl. at 319 (citing *CliniComp Int'l Inc. v. United States*, 117 Fed. Cl. 722, 742 (2014)). To demonstrate unequal treatment, "a protester must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or "that the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits,

formatting requirements, or submission deadlines." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citations omitted). If a protester demonstrates that its proposal deficiencies were substantively indistinguishable from other proposals not similarly downgraded, "a reviewing court can then comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion[.]" *Id.* at 1373 (citation omitted).

Section L.5.7.2 of the RFP required offerors to "use . . . the Microsoft Excel spreadsheet in Attachment J.P-9 [as the] cost/price template." AR Tab 27 at 1677. The J.P-9 template "consists of 15 years, including the five-year base ordering period and five-year option ordering period of the master contract, plus an additional five years covering task order performance beyond the master contract ordering period." *Id.* To complete the template, offerors were required to insert maximum direct labor rates for each labor category during year 1, indirect rates from government "approved billing rates and/or forward pricing rate recommendations and/or agreements" or indirect rates generated from their accounting system (if the offeror does not have government approved rates), and proposed profit. *Id.* at 1677-78; *see also* AR Tab 22 (J.P-9 template provided to offerors). The J.P-9 used this information to automatically calculate fully burdened rates for years 2 through 15 for each labor category within the template. AR Tab 27 at 1677 ("Maximum rates for years 2 through 15 will automatically be calculated for each labor category by an escalation factor embedded in the spreadsheet."). The RFP stated that "[t]he offeror must ensure all the requested proposal submission information is current, accurate, and complete per Section L.5.7 [cost/price]." *Id.* at 1688. The RFP also cautioned offerors that "[a]n offer may [] be rejected if any one or more required submittals is missing or incomplete on the cost/price template per Attachment J.P-9." *Id.* The RFP informed offerors that "cost/price proposals may only be modified as a result of discussions, and offerors are advised that the government intends to make an award based on initial proposals without discussions." *Id.* at 1688.

OM Partners did not submit a J.P-9 with its proposal. *See* AR Tab 44 at 241 (GSA acceptability review stating that OM Partners' "[p]roposal passed initial acceptability review" but was rejected because "the offeror did not submit a J.P-9"). GSA issued a clarification to OM Partners on August 7, 2024, regarding its missing J.P-9 document. *See* AR Tab 69 at 11937. GSA informed OM Partners that "[n]o new documents may be submitted in response to this request" and asked it to "identify where in [its] [SB] pool submission a completed J.P-9 cost/price template is submitted as required by [Section] L.5.7.2." AR Tab 68 at 8731 (emphasis omitted). OM Partners responded on August 13, 2024, stating that it "inadvertently uploaded the wrong pricing file in the SB track but the correct J.P-9 file [was submitted] in the WOSB track on the same day." AR Tab 69 at 11937. It also provided a separate attachment with the J.P-9 template from its WOSB proposal. *See* AR Tab 68 at 8732. In the evaluation summary, the SSA rejected OM Partners' proposal and stated that "[f]ollowing review of the clarifica[t]ion, it was verified that the offeror did not submit a J.P-9 in accordance with [Section] L.5.7.2 and instead submitted a different spreadsheet that did not have the required information on it." AR Tab 45 at 270. In its debriefing, GSA informed OM Partners that its WOSB J.P-9 "was not considered since it was not within the government's control by the due date for the response to Amendments 0009 and 0010 (November 7, 2023)" and that GSA "rejected [its] proposal as [OM Partners] did

not submit an Attachment J.P-9 cost/price template as required by [Section] L.5.7.2[.] AR Tab 68 at 8834, at *3.

[***], on the other hand, submitted a proposal with an incomplete J.P-9. AR Tab 68 at 6910. Its J.P-9 failed to include indirect burden rates. *Id.* GSA issued a clarification to [***] on March 14, 2023, regarding its incomplete J.P-9 document. *See* AR Tab 69 at 11929. GSA's clarification informed [***] that "[n]o new documents may be submitted in response to this request," and stated that "[t]he J.P-9 submitted listed direct labor rates but did not include any indirect burdens." AR Tab 68 at 6892. As part of the clarification, GSA attached a completed J.P-9 from [***] that GSA had in its possession. *See id.* at 6891-92. GSA asked [***]: "As supported by [its BOE] and provided provisional billing rates, did [it] intend to propose as indicated in the attached document?" *Id.* at 6892. [***] responded on March 20, 2023, that it "ha[d] reviewed the clarification request documents and submitted [J.P-9]" and that the J.P-9 "appear[ed] to have had a clerical error and should have included indirect rate burdens." AR Tab 69 at 11929. [***] further explained that "[t]he correct [J.P-9] is the one that [it] submitted for [the] Polaris WOSB [track] and that [GSA] attached to this clarification request which is in line with [[***] BOE]." *Id.* GSA accepted [***] indirect burden rates, continued to evaluate its proposal, and included it on the awardee list in GSA's notice of award. *See* AR Tab 48 at 6.

This record demonstrates that GSA treated OM Partners unequally by allowing [***] to complete its J.P-9 using its WOSB J.P-9 but precluding OM Partners from doing the same. If an offeror's proposal did not include a J.P-9 or included an incomplete J.P-9, the RFP gave GSA the discretion to reject the proposal. AR Tab 27 at 1688. This discretion, however, did not allow GSA to reject offers with missing J.P-9s and accept offers with materially incomplete J.P-9s. In both cases, GSA was unable to evaluate the offeror's cost proposal without the missing information. Further, while GSA used clarifications to seek the missing information from both offerors, it allowed [***] to complete its J.P-9 with information from its WOSB J.P-9 and did not allow OM Partners to do the same. GSA's rationale for allowing [***] to use the information contained in its WOSB J.P-9—that it was "supported by" [***] proposed BOE and provisional billing rates—also applies to OM Partners. In other words, OM Partners' WOSB J.P-9 is also supported by its proposed BOE and provisional billing rates.[23] Accordingly, GSA acted arbitrarily when it rejected OM Partners' proposal and accepted [***] substantively indistinguishable proposal. *See Office Design Grp.*, 951 F.3d at 1372.[24]

---

[23] For its direct labor rates, OM Partners' BOE states that it "used the [GSA] provided Attachment J.P-10 Direct Labor Rate Ranges['] . . . [***] of direct labor rates per labor category." AR Tab 68 at 8705, at *7. OM Partners' indirect rates are included in Appendix A to its BOE. *Id.* at 8704. Its BOE describes the Appendix A document as "2023 Contractor Site provisional rates detailing pools and bases (by expense accounts)." *Id.* at 8705, at *7. It also states that OM Partners "has calculated the fee at [***] of the fully burdened direct labor." *Id.* at 8705, at *9. These required J.P-9 inputs are consistent with OM Partners' WOSB J.P-9 submission. *Compare id.* at 8732 (OM Partners' WOSB J.P-9) *with id.* at 8704 (OM Partners' Appendix A to its BOE) *and id.* at 8705 (OM Partners' BOE).

[24] OM Partners also argues that its omission of a J.P-9 submission was "a clerical issue" that "could have been easily rectified during the clarification process by providing the omitted document." [ECF 65-1] at 21. The Court is unpersuaded. The RFP stated that GSA "may conduct clarifications, as described in FAR 15.306(a)." AR Tab 27 at 1681. The RFP also required offerors to submit a J.P-9 document, *id.* at 1677, and stated that "[a]n offer may [] be rejected if any one or more required submittals [are] missing or incomplete on . . . the J.P-9." *Id.* With respect to OM Partners' proposal, GSA exercised its discretion to conduct clarifications to determine if OM Partners had submitted

OM Partners has shown that GSA erred in rejecting its proposal. The Court must now determine whether OM Partners was prejudiced by this error. To prevail in a protest, a protester "must show not only that significant errors occurred in the procurement process, but also that the errors were prejudicial." *Advanced Data Concepts, Inc.*, 216 F.3d at 1057. "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data Gen. Corp.*, 78 F.3d at 1562 (citations omitted)). Instead, a protester must show that "but for the alleged error, there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration." *Allied Tech. Grp., Inc.*, 649 F.3d at 1326 (alteration in *Allied Tech. Grp., Inc.*) (quoting *Statistica, Inc.*, 102 F.3d at 1581). Thus, to show prejudice, OM Partners must show that, but for GSA's errors, it would have had a substantial chance to be ranked within the top 100 and receive an award. The Court finds that OM Partners has established prejudice.

OM Partners argues that "[h]ad [it] been able to rely on its WOSB J.P-9 submission—like [***] was allowed to do—[it] would have progressed to the technical evaluation where it stood a substantial chance for award" because it had a "claimed scored of [***] points," [ECF 65-1] at 26-27, which "exceeded the [***]-point threshold for award," *id.* at 26-27. The Court agrees. Had GSA allowed OM Partners to rely on its WOSB J.P-9 submission, OM Partners' proposal would not have been rejected. Further, with a claimed score of [***] points, AR Tab 68 at 8702, *5, OM Partners' proposal would have been within the top 100 highest scoring proposals, AR Tab 71 at 12453-55. While it is possible that GSA will deduct points from OM Partners' claimed score upon further evaluation, the fact that its proposal would be in the top 100 highest scoring proposals but for GSA's error demonstrates that it has a substantial chance of award.

### F. Rigil's Challenges

Rigil argues that "GSA erred when it deducted 10,900 [claimed] points . . ., despite [Rigil] following the explicit instructions set forth in the RFP and its submission of the requisite supporting documentation to claim these points." [ECF 66-1] at 25. According to Rigil, GSA claims that Rigil "failed to submit the required verification documents, specifically a signed copy of the original contract award document in an acceptable form." *Id.* at 31. However, Rigil asserts that GSA "misinterprets the plain language of the RFP . . . [by] improperly transform[ing] a non-exhaustive, permissive list of example forms into an exclusive set of mandatory formats." *Id.* at 32. Rigil contends that "GSA's rigid approach is inconsistent with the RFP's underlying purpose to ensure the agency receives credible, verifiable documentation substantiating an offeror's claimed experience." *Id.* at 33. Rigil further contends that, "[e]ven if GSA's deduction of 10,900 points was based on a plausible reading of the RFP . . . [t]he RFP's language, by using permissive terms and offering examples rather than strict mandates on government-issued documents, created a latent ambiguity that [Rigil] could not have recognized or raised prior to the proposal deadline, as GSA's interpretation only became apparent after award during the debriefing process." *Id.*

---

"a completed J.P-9 cost/price template . . . as required by [Section] L.5.7.2." AR Tab 68 at 8731. When OM Partners responded that its proposal did not contain the required J.P-9 document, GSA acted within its discretion to reject it.

The government contends that because "Rigil did not submit the required documents to validate the points it claimed for one of its five primary relevant experience projects . . . [, it] did not get any points for that project at all." [ECF 86] at 28. According to the government, "[t]he RFP requirements list which specific documents are required to validate a primary relevant experience project and Rigil failed to meet those requirements for the Advance Digital Systems (ADS) project." *Id.* at 31-32. Additionally, contrary to Rigil's assertion that "the RFP contains a latent ambiguity regarding whether the list of required forms was limited to the forms listed," the government contends that the primary relevant experience verification requirement is unambiguous and that "[t]he required contents of the Other Official Government Award Form are clear, and dollar value 'must' be included." *Id.* at 33. The government argues that "[e]ven assuming the RFP contains an ambiguity," Rigil's ambiguity claim is waived because it "was on notice of this ambiguity prior to submitting its proposal[.]" *Id.* at 34.

The Court finds that GSA properly deducted 10,900 points from Rigil's claimed score. Interpretation of a solicitation "begin[s] with the plain language of the document [and] [i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain meaning." *Per Aarsleff A/S*, 829 F.3d at 1309 (emphasis omitted) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353). When interpreting a solicitation term, a court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.* (emphasis omitted) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353).

The RFP advised offerors that "[a]ll proposal information is subject to verification by [GSA]" and required that offerors "ensure all proposal information submitted is verifiable." AR Tab 27 at 1649. It also contained the following guidance:

> NOTE: This [RFP] instructs offerors to provide supporting documentation for all scored evaluation criteria. While some sub-sections of Section L may indicate an offeror must provide a particular form of documentation for validation purposes, offerors may provide additional verifiable documentation to validate any claimed scoring elements.

*Id.* To demonstrate primary relevant experience, Section L.5.2.2 required that offerors submit a minimum of three primary relevant experience projects, *id.* at 1659, and that each "[i]ndividual project value [] be equal to or greater than $250,000," *id.* at 1660. Section L.5.2.2.1.1 set forth the documentation required for verification of the claimed scoring elements for a primary relevant experience project as follows:

> In order to receive points for each submitted primary relevant experience project, offerors must submit . . . the following documents for verification of claimed scoring elements:
>
> 1. Submit a [Federal Procurement Data System-Next Generation ("FPDS-NG")] report that provides verification of all claimed scoring elements . . . ; **OR**

2. If the FPDS-NG report is not available or the FPDS-NG report does not substantiate **all claimed scoring elements** . . . , the following verification documents must be included:

    a. If available, FPDS-NG report that provides verification of **any** claimed scoring elements. . . .

    b. Project Verification Form . . . **signed by a contracting officer (CO) with cognizance over the submitted project**. The Project Verification Form must include the CO's direct telephone number and direct email address.

    If the cognizant contracting officer's signature is unattainable, [GSA] will accept the signature of the contracting officer's representative (COR) or other government employee with cognizance over the submitted project. The Project Verification Form must include both cognizant CO's and verifying government employee's direct telephone numbers and email addresses.

    **NOTE**: If a project requires a signature for verification and is not signed by the appropriate party (or parties) as indicated throughout Section L, the associated points will not be earned.

    c. Signed copy of **original contract award document**, this may include the following:

    - [SF]1449 – Solicitation/Contract/Order for Commercial Items – (Block 17a identifies the prime contractor, Block 9 identifies the U.S. federal government agency, Block 3 identifies the award/effective date, and Block 31c. identifies the date the contracting officer signed).

    - SF26 – Award/Contract – (Block 7 identifies the prime contractor, Block 5 identifies the U.S. federal government agency, Block 3 identifies the effective date, and Block 20C identifies the date the contracting officer signed).

    - SF33 – Solicitation, Offer and Award – (Block 15A identifies the prime contractor, Block 7

identifies the U.S. federal government agency, and Block 28 identifies the date the contracting officer awarded/signed).

- Department of Defense (DD) 1155 – Order for Supplies or Services (Block 9 identifies the prime contractor, Block 6 identifies the U.S. federal government agency, Block 3 identifies the date of order, and Block 24 identifies the contracting officer signature).

- Optional Form 307 – Contract Award (Block 7 identifies the prime contractor, Block 5 identifies the U.S. federal government agency, Block 2 identifies the effective date, and Block 15C identifies the date the contracting officer signed).

- GSA Form 300 – Order for Supplies and Services (Block 6 identifies the prime contractor, Block 10 identifies the U.S. federal government agency, Block 1 identifies the [d]ate of order, and Block 26C identifies the date the contracting officer signed).

- Other Official Government Award Form not identified above (must explicitly identify the contractor, government agency, order number, dollar value, and the date the contracting officer awarded/signed).

d. **Copy of Contract Statement of Work [("SOW"):]** The [SOW], or Performance Work Statement (PWS), from the contract that describes the general scope, nature, complexity, and purpose of the supplies or services the customer acquired under the contract[.]

*Id.* at 1661-62.

Rigil submitted a timely proposal in response to the RFP, *see* AR Tab 68 at 10029, claiming a total score of [***] points, *id.* at 9910, at *6. For one of its primary relevant experience projects, Rigil submitted the ADS project. *See id.* at 9990, at *1. Because the ADS project does not have an FPDS-NG report, *see* AR Tab 69 at 11940, Rigil submitted a Project Verification Form as a required verification document, AR Tab 68 at 9989. The form stated that the project value was $13,742,421.89, *id.*, at *1, and was signed by a contract specialist with Rigil's government customer —the United States House of Representatives, *id.*, at *2. Rigil also

submitted a "Solicitation, Offer and Award Form" issued by the United States House of Representatives as the original contract award document. *Id.* at 9990, at *1. However, this document was not one of the standard forms listed in the RFP as an original contract award document. AR Tab 27 at 1661-62. Rather, the document qualified as an "Other Official Government Award Form." *Id.* at 1662. Importantly, the form did not contain a block for contract value, and, therefore, it did not indicate the dollar value. *See* AR Tab 68 at 9990, at *1.

GSA issued a clarification to Rigil on September 3, 2024, regarding the ADS contract value. *See* AR Tab 69 at 11940. GSA stated that "the claimed project size (project value) [for the ADS project] is unable to be verified in accordance with the requirements of [Section] L.5.2.2." AR Tab 68 at 9938 (emphasis omitted). GSA further stated that it was "unable to locate an FPDS-NG report." *Id.* (emphasis omitted). Accordingly, GSA asked: "Was an award form with the contract value clearly indicated provided in support of the claimed project size?" *Id.* (emphasis omitted). Rigil responded that the ADS project "does not have a[n] FPDS report as it [is] for the House of Representatives." AR Tab 69 at 11940 (capitalization omitted). Rigil referred GSA to its Project Verification Form, the award form, the SOW, and the latest modification issued under the contract, which were submitted by Rigil to verify the project. *Id.* In the evaluation summary, the SSA stated: "Following review of the clarification for . . . [ADS] . . . [n]o dollar value is listed on the submitted award form and no additional contract documentation was submitted to validate contract value as required by [Section] L.5.2.2.1.1(2)(c)." AR Tab 45 at 267. Accordingly, GSA deducted 10,900 points and stopped evaluating Rigil's proposal because it fell outside the top 100 highest scoring proposals. *Id.* Rigil's debriefing stated that GSA "was unable to verify the claimed score for the . . . [ADS] . . . relevant experience project per [Section] L.5.2.2.1.1(2)(c)" because "[n]o dollar value is listed on the submitted award form." AR Tab 68 at 10034, at *3. GSA again informed Rigil that "[a]ll claimed points related to the . . . [ADS] . . . project were deducted[.]" *Id.*

GSA properly deducted 10,900 points from Rigil's claimed score because it failed to submit additional documentation to verify the value of the ADS project in accordance with the RFP requirements. Under Section L.5.2.2.1.1, when no FPDS-NG report exists to substantiate the claimed scoring elements for a primary relevant experience project, the offeror was required to submit a Project Verification Form, a "[s]igned copy of [the] original contract award document," and a copy of the SOW. AR Tab 27 at 1661-62 (emphasis omitted). To satisfy the requirement for a copy of the "original contract award document" under L.5.2.2.1.1(2)(c), the offeror was permitted to provide one of the enumerated standard award forms or, alternatively, an "Other Official Government Award Form" not identified as one of the enumerated standard forms. *Id.* Significantly, if the offeror used an "Other Official Government Award Form," the form was required to "explicitly identify . . . [the] dollar value[.]" *Id.* at 1662. Because Rigil used an "Other Official Government Award Form" issued by the United States House of Representatives that did not include the dollar value, GSA properly determined that Rigil failed to verify this proposal element in accordance with the RFP requirements and correctly deducted the applicable points. *See Per Aarsleff A/S*, 829 F.3d at 1309 ("If the provisions of the solicitation are clear and unambiguous, they must be given their plain meaning[.]" (emphasis omitted) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353)).

The Court rejects Rigil's argument that, "[e]ven if GSA's deduction of 10,900 points was based on a plausible reading of the RFP . . . [t]he RFP's language, by using permissive terms and offering examples rather than strict mandates on government-issued documents, created a latent ambiguity[.]" [ECF 66-1] at 33. Section L.5.2.2.1.1 of the RFP explicitly requires that offerors provide a "[s]igned copy of [the] original contract award document." AR Tab 27 at 1661 (emphasis omitted). Although this section explains that such award document *may* include one of the standard award forms listed in the RFP or an "Other Official Government Award Form" not included in the listed standard forms, it explicitly requires that the offeror provide *the* actual original award document issued by the government entity regardless of its form. *See id.* To the extent that an offeror provides an "Other Official Government Award Form," the RFP explicitly requires that such form contain certain information, including a dollar value. *Id.* at 1662. These requirements are not ambiguous. While Section L.3 permits offerors to "provide *additional* verifiable documentation to validate any claimed scoring elements," *id.* at 1649 (emphasis added), it does not allow an offeror to rely on the other mandatory documentation required by Section L.5.2.2.1.1 to satisfy a claimed scoring element. Rather, Section L.3 requires verifiable documentation that is in addition to the mandatory documentation. Despite the plain language of the RFP, Rigil did not provide any additional documentation to verify the value of its ADS project.

### G. Assyst's Challenges

Assyst raises various challenges to GSA's evaluation of its primary and emerging technology relevant experience projects under Section L.5.2 of the RFP. *See* [ECF 69] at 18-41. However, Assyst conceded during oral argument that it must prevail on its challenge to GSA's evaluation of its Electronic Submissions Gateway ("ESG") project to demonstrate prejudice and thus succeed in its protest. Oral Argument at 1:16:29-1:17:00, *BEAT-LDI JV LLC v. United States*, No. 25-82C (Fed. Cl. Apr. 24, 2026) ("[O]ur case . . . rises and falls on ESG because . . . we lost 6,200 points there [and] [w]ith these 6,200 points we would be well into the awardee section. [The Verification and Validation ("V&V") project] is only . . . 1,300 points so that is not going to be enough[.]"). Therefore, the Court focuses on Assyst's ESG challenge. In this regard, Assyst argues that GSA's deduction of 6,200 points from its claimed score was improper because "GSA failed to properly validate [its] claimed points for the ESG . . . relevant experience project[.]" [ECF 69] at 18. Specifically, Assyst contends that "GSA failed to validate the total contract value of the ESG IDIQ, which Assyst's FPDS-NG reports showed has a total contract value of over $10 million and which was funded at the contract level, as was required by the RFP." *Id.* at 19. Assyst further contends that "GSA irrationally determined that it could not validate Assyst's claimed NAICS code of 51820 and its claimed emerging technology category of advanced and quantum computing [because of] differences between the [Procurement Instrument Identifiers ("PIIDs")] used by [the United States Food and Drug Administration ("FDA")] in its base contract, its FPDS-NG entries, and the SOW." *Id.*

The government explains that "GSA concluded that . . . the ESG project could not be validated for all of the elements claimed by Assyst and deducted points accordingly." [ECF 86] at 64. The government contends that "supporting documentation was provided for the [ESG] IDIQ only." *Id.* The government further states that "GSA continued evaluating documents submitted by Assyst for the ESG project, however, these documents were related to the IDIQ and

not the sole funded task order[.]" *Id.* at 65 (citing AR Tab 68 at 1270-74). Therefore, the government argues that "GSA could not use these documents to validate the $10[] [million] project value claim, emerging technology (including breadth), or a change in NAICS code." *Id.*

The Court finds that GSA properly deducted Assyst's claimed primary and emerging technology relevant experience points for its ESG project. Interpretation of a solicitation "begin[s] with the plain language of the document [and i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain meaning." *Per Aarsleff A/S*, 829 F.3d at 1309 (emphasis omitted) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353). When interpreting a solicitation term, a court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.* (emphasis omitted) (quoting *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353).

Section L.5.2.2 of the RFP required that offerors "submit a minimum of three (3) and . . . a maximum of five (5) distinct primary relevant experience projects." AR Tab 27 at 1659 (emphasis omitted). Section L.5.2.1 defined a "relevant experience project" as follows:

> (1) a single contract or subcontract;
> (2) a single task order awarded under a multiple award contract [];
> (3) a single task order awarded under a master single-award indefinite delivery task order contract (definite quantity, requirements, or indefinite quantity) (FAR 16.5);
> (4) a single task order placed under a Federal Supply Schedule contract (FAR 8.405-2);
> (5) a single task order placed under a blanket purchase agreement (BPA) (FAR 8.405-3 or FAR 13.303);
> (6) a single task order placed under a basic ordering agreement (BOA) (FAR 16.703);
> (7) a single Other Transaction Authority (OTA) award issued under 10 U.S.C. 4021 or other applicable authority; or
> (8) a single grant.

*Id.* at 1658. This section also stated that "[a]n [IDIQ] contract may not be claimed as a project unless performance is evident through funding at the contract level" and that "[t]ypically, performance on an [IDIQ] contract is through one or more task orders." *Id.*

For each submitted primary relevant experience project, the "[i]ndividual project value [had to] be equal to or greater than $250,000," AR Tab 27 at 1660, and offerors were able to receive additional points for increased project values—with maximum points available for projects "with a value equal to or greater than $10 million," *id.* at 1685. Each submitted project was required to include performance in one of the five NAICS codes listed in the RFP, and an offeror was only allowed to claim one NAICS code per project. *Id.* at 1659-61. The RFP permitted offerors to claim maximum primary relevant experience points if the offeror demonstrated "experience [] in [all] five NAICS areas." *Id.* at 1686. "[T]o receive points for each submitted primary relevant experience project, offerors [were required to] submit . . . documents for verification of [the] claimed scoring elements[.]" *Id.* at 1661. Such documentation consisted

of an "FPDS-NG report" or, "[i]f the FPDS-NG report is not available or . . . does not substantiate all claimed scoring elements," a "Project Verification Form" signed by a government employee with cognizance over the project and containing the government employee's contact information, a "[s]igned copy of [the] original contract award document," and a copy of the SOW. *Id.* at 1661-62 (emphasis omitted).

Separately, for each submitted emerging technology relevant experience project, the "[i]ndividual project value [had to] be equal to or greater than $250,000," AR Tab 27 at 1666, and each project submitted had to "include[] the performance of one of the emerging technologies listed in" the RFP, *id.* The RFP permitted offerors to use the same project "for both primary relevant experience and emerging technology experience." *Id.* Further, it allowed offerors to claim maximum emerging technology points for "experience demonstrated with three emerging technologies." *Id.* at 1686. "[T]o receive points for each submitted emerging technology relevant experience project, offerors [were also required to] submit . . . [a] Project Verification Form" signed by a government employee with cognizance over the project and containing the government employee's contact information, a "[s]igned copy of [the] original contract award document," and a copy of the SOW. *Id.* at 1667-68.

Assyst submitted a timely proposal, *see* AR Tab 68 at 1284, at *1, and claimed a total score of [***] points, *id.* at 1205, at *5. For the ESG project, Assyst submitted a signed contract award document for Contract No. HHSF223201810012I, which indicated that it was an IDIQ contract with a "Total Award Amount" of $0.00. *Id.* at 1271, at *1. The award document included an "Amount" of $19,999,999.00 for the IDIQ's five-year ordering period. *Id.,* at *2. It also showed an "Obligated Amount" of $0.00. *Id.* Assyst also provided two FPDS-NG reports to substantiate the IDIQ contract. *Id.* at 1272. One of the reports contained the following PIID: 75F40118D10012. *Id.*, at *1. It indicated that 75F40118D10012 is an IDIQ contract, *id.*, at *2, with a "Total Contract Value" of $19,999,999.00, *id.*, at *1, a "Total Action Obligation" of $0.00, *id.,* and a principal NAICS code of 541512, *id.*, at *2. The other report contained the following PIID: 75F40118F01001. *Id.*, at *4. It indicated that 75F0118F01001 is a task order issued under the IDIQ, *see id.*, at *4, with a "Total Contract Value" of $9,802,640.00 and a "Total Action Obligation" of $9,802,639.99, *id.* Assyst also submitted a Project Verification Form for the ESG project. AR Tab 68 at 1273. It identified HHSF223201810012I as the contract number, 75F40118D10012 as the applicable order number, $19,999,999.00 as the project value, 518210 as the claimed NAICS code, and advanced and quantum computing as the claimed emerging technology. *Id.*, at *1-*2. Because the principal NAICS code on the ESG IDIQ's FPDS-NG report was not the same as its claimed NAICS code, Assyst provided the ESG IDIQ's SOW to substantiate the claimed NAICS code. *See id.* at 1270, at *6. In addition, Assyst used the SOW to substantiate the claimed emerging technology category. *See id.*, at *26.

GSA evaluated the ESG project as follows:

> Supporting documents provided do not meet the RFP requirement to support the full claimed [points for] primary relevant experience and [emerging technology]. Points to be given for the FPDS verified claims. Claimed task order number in [Project Verification Form] is listed as IDIQ number in the FPDS and award documents.

AR Tab 45 at 794. GSA issued a clarification to Assyst on March 14, 2024, regarding the ESG project. *See* AR Tab 69 at 11939. GSA asked Assyst to "confirm [that] the [ESG] project, 75F40118D10012, is an [IDIQ] contract" and "[i]f so, is performance evident through funding at the contract level ([Section] L.5.2.1)?" AR Tab 68 at 1215. Assyst responded on March 20, 2024, AR Tab 69 at 11939, stating that "[y]es, the [ESG] relevant experience project is an [IDIQ] contract," AR Tab 68 at 1216; AR Tab 69 at 11939. Assyst further stated that "performance is evident through funding at the contract level ([Section] L.5.2.1), and this is substantiated on Page 4 of [Assyst's FPDS-NG report for PIID 75F40118F01001]." AR Tab 68 at 1216; AR Tab 69 at 11939. In the evaluation summary, the SSA stated: "Following review of the clarification for claimed relevant experience project [ESG], although the offeror i[n]dicated the project was an IDIQ, they pointed to the FPDS for task order 75F40118F01001." AR Tab 45 at 266. The SSA further stated: "The submitted [Project Verification Form] referenced the wrong contract number and a signed copy of the original contract award document for the [task order] was not provided, points only given for elements verified by FPDS report for the [task order in accordance with Section] L.5.2.2.1.1(1)." *Id.* The SSA therefore deducted 6,200 points for the ESG project and stopped evaluating Assyst's proposal because it fell outside the top 100 highest scoring proposals. *See id.*; *id.* at 795-96. Assyst's debriefing reiterated the SSA's conclusions set forth in its evaluation summary. *Compare id.* at 266 *with* AR Tab 68 at 1293, at *3.

GSA properly deducted Assyst's claimed primary and emerging technology relevant experience points for its ESG project because the plain language of the RFP does not allow offerors to receive points for IDIQ contracts that are not funded at the contract level. To use an IDIQ contract as a relevant experience project, an offeror needed to demonstrate that "performance [was] evident through funding at the contract level." AR Tab 27 at 1658. The FAR sets forth the "basic requirements for contract funding[.]" FAR 32.700. A contract is considered funded if funds are either fully or incrementally obligated on the contract vehicle. *See* FAR 32.703-1. Thus, Assyst's contention that an offeror need only provide a funded task order under an IDIQ to demonstrate that the IDIQ is "funded at the contract level" is misplaced. According to the FAR, an IDIQ contract must include obligated funds to be "funded at the contract level," *see id.*, and Assyst's ESG IDIQ did not include any obligated funds, AR Tab 68 at 1272, at *1. Further, the RFP warned offerors against using an IDIQ by stating that IDIQ contracts do not typically include obligated funding. *See* AR Tab 27 at 1658 (stating that "[t]ypically, performance on an [IDIQ] contract is through one or more task orders").[25] Because the ESG

---

[25] This is logical because the purpose of providing relevant experience projects under the RFP is to demonstrate *performance* in one of the listed NAICS codes or in one of the listed emerging technology categories. *See* AR Tab 27 at 1659 (stating that primary relevant experience projects must "include[] performance in one of the NAICS" and "the claimed NAICS must have been integral to the performance of the project"); *id.* at 1666 (stating that emerging technology relevant experience projects "must have included the performance of one of the emerging

IDIQ was not a valid relevant experience project under the RFP, GSA could not validate Assyst's claimed primary and emerging technology relevant experience points that relied on the ESG IDIQ documentation. GSA could only validate claimed points for task order 75F40118F01001 that were verifiable within its FPDS-NG report. AR Tab 45 at 266. Accordingly, GSA properly deducted 6,200 points from Assyst's claimed score.[26]

## IV. INJUNCTIVE RELIEF

As explained above, DevTech and OM Partners have succeeded on the merits of their protests by demonstrating that GSA made prejudicial errors during its evaluation of proposals under the RFP for the Polaris GWAC SB pool. The Court must now determine whether DevTech and OM Partners are entitled to their requested relief. Both ask the Court to enjoin GSA from making any awards under the RFP and to require GSA to reasonably evaluate proposals in accordance with the RFP. *See* [ECF 71-1] at 32-34; Compl., *DevTech Sys., Inc. v. United States*, No. 25-225 at 60 (Fed. Cl. filed Feb. 6, 2025); [ECF 65-1] at 29-33; Compl., *OM Partners JV 2 v. United States*, No. 25-152 at 12-13 (Fed. Cl. filed Jan. 28, 2025). Under the Tucker Act, the Court is empowered to "award any relief that the court considers proper, including declaratory and injunctive relief[.]" 28 U.S.C. § 1491(b)(2). As a prerequisite to granting a permanent injunction, "the court must consider whether (1) the [protester] has succeeded on the merits, (2) the [protester] will suffer irreparable harm if the court withholds injunctive relief, (3) the balance

---

technologies"). As stated in the RFP, performance on an IDIQ is typically through task orders. *Id.* at 1658. An IDIQ alone usually does not demonstrate performance and, therefore, fails to demonstrate any of the relevant experience required by the RFP.

[26] Assyst's remaining arguments are unpersuasive. First, Assyst argues that "GSA erroneously concluded that . . . [its] proposal [] did not contain the original [ESG] IDIQ contract." [ECF 69] at 20 (citing AR Tab 68 at 1293, at *3). Assyst is correct that its debriefing from GSA states that "[a] signed copy of the original contract award document was not submitted for the ESG project." AR Tab 68 at 1293, at *3 (emphasis omitted). GSA's statement, however, pertains to "a signed copy of the original contract award document for [task order 75F40118F01001]," not the ESG IDIQ. *Id.* Further, Assyst received all claimed points that were verifiable by the FPDS-NG report for the task order. AR Tab 45 at 266. Second, Assyst contends that a latent ambiguity exists because "the RFP required offerors to provide contact information for the contracting officer or [contracting officer's representative] . . . if verification of certain claimed points was not evident from an FPDS-NG report or if there was confusion about the documentation an offeror provided to substantiate its claimed points," [ECF 69] at 35 (citing AR Tab 16 at 1096), and the record "does not reflect that GSA contacted any verifying official, *id.* (citing AR Tab 45). Despite the RFP requirement to provide contact information for verifying officials, GSA was under no obligation to contact such official when it properly deducted Assyst's claimed points. Third, Assyst argues that "GSA should have . . . initiated a minor clarification with [it] specifically relating to the contract numbers FDA used on the ESG project and the typo[graphical error] in FDA's SOW for the ESG project." *Id.* at 36. However, GSA did conduct clarifications regarding the ESG IDIQ and did not take issue with the contract number discrepancy or typographical error. *See* AR Tab 68 at 1215 (clarification not discussing contract number discrepancy or typographical error in SOW). Fourth, Assyst contends that "the record does not provide adequate rationale to support GSA's evaluation of Assyst's proposal . . . [because] the evaluation documents provide no basis, analysis, or support for GSA's erroneous conclusions." [ECF 69] at 39. GSA supported its decision to deduct Assyst's claimed points, which relied upon the ESG IDIQ, by explaining that the FPDS-NG report that purportedly substantiated that "performance is evident through funding at the contract level" for the ESG IDIQ was for a task order. *See* AR Tab 45 at 266 (stating that "although the offeror i[n]dicated the project was an IDIQ, they pointed to the FPDS for task order 75F40118F01001"). Lastly, Assyst argues that "GSA conducted a flawed [HTRFRP] determination under the RFP with respect to Assyst's proposal because GSA incorrectly reduced Assyst's claimed points under the relevant experience factor." [ECF 69] at 40. However, for the reasons explained herein, GSA's HTRFRP determination was not flawed because it properly deducted Assyst's claimed points that relied on the ESG IDIQ.

of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc.*, 554 F.3d at 1037 (citing *PGBA, LLC*, 389 F.3d at 1228-29). Although DevTech and OM Partners have succeeded on the merits of their protests, the Court must determine whether the equitable factors weigh in favor of granting the requested injunctive relief. *See Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 353 (2012) ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well." (citing *PGBA, LLC*, 389 F.3d at 1226, 1228-29)).

The equitable factors weigh in favor of granting the requested injunctive relief. First, DevTech and OM Partners will suffer irreparable harm without an injunction because no adequate alternative remedy exists for their lost opportunity to be fairly evaluated and considered for a contract award under the Polaris SB pool RFP. *See Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016) ("The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." (quoting *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013)), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018). Second, the balance of hardships weighs in their favor. Indeed, the government does not allege how it will be harmed if the Court grants injunctive relief. *See* [ECF 86] at 109. Rather, the government's sole argument is that the protesters' claims fail on the merits. *Id.* To the extent that the protesters succeed on the merits of their claims, the government suggests that "any injunction should consist of a remand to [GSA] to conduct its evaluation in accordance with the specific aspects of [its] evaluation that this Court identifies as deficient in any adverse decision." *Id.* On this basis, the Court concludes that a permanent injunction will not harm the government beyond the additional costs and delays normally associated with such relief, which is insufficient to outweigh the harm to protesters. *See DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 612 (2023) (presuming that the government will not be harmed where the government did not respond to plaintiff's balance of hardships argument); *see also 22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 402 (2025) (citation omitted) ("[T]he harm to the [a]gency of having to reconsider a procurement in a fair and rational way does not outweigh the harm to an individual organization that was denied its right to fair consideration."); *Sys. Stud. & Simulation, Inc. v. United States*, 146 Fed. Cl. 186, 203 (2019) ("[O]nly in an exceptional case would [delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests." (second alteration in original) (quoting *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006), *appeal dismissed*, 275 Fed. App'x 968 (Fed. Cir. 2008))). Lastly, granting DevTech's and OM Partners' request for injunctive relief serves the public interest because "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Eleit Tech., Inc. v. United States*, 179 Fed. Cl. 592, 608-09 (2026) (first quoting *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003); and then citing *Sys. Dynamics Int'l, Inc. v. United States*, 167 Fed. Cl. 780, 797-98 (2023)). Ultimately, "[t]he public interest is best served by requiring [GSA] to comply with federal procurement law" by correcting its arbitrary procurement actions. *CW Gov't Travel, Inc.*, 110 Fed. Cl. at 496. Accordingly, DevTech and OM Partners are entitled to injunctive relief.

## V. CONCLUSION

For the foregoing reasons, the MJARs filed by DevTech, [ECF 71], and OM Partners, [ECF 65], are **GRANTED**; the MJARs filed by GenceTek, [ECF 70], BLJV, [ECF 74], Rigil, [ECFs 62, 66], and Assyst, [ECF 69], are **DENIED**; and the cross-MJAR filed by the government, [ECF 86], is **GRANTED-IN-PART** and **DENIED-IN-PART**. Additionally, Assyst's motion to amend its complaint, [ECF 67], is **GRANTED**.

GSA is **ENJOINED** from making any awards under the RFP until it takes action to address the prejudicial errors identified in this Opinion and Order. The Clerk of the Court is **DIRECTED** to enter final judgment accordingly.

Some information contained in this Opinion and Order may be considered protected information subject to the protective order, [ECF 11], entered on January 27, 2025. Accordingly, the Opinion and Order is **FILED UNDER SEAL**. The parties **SHALL CONFER AND FILE on or before September 25, 2026**, a joint status report that: identifies information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion and Order.

Additionally, several of the parties have not complied with their obligation to file redacted versions of their own filings. *See* [ECF 11] ¶ 12. The parties are **ORDERED** to file the required redacted versions **on or before October 2, 2026**.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge